STATE, Plaintiff-Respondent, v. SCHLISE, Defendant-Appellant.†

Supreme Court

*No. 77–322–CR. Argued October 4, 1978.— Decided November 28, 1978.*

(Also reported in 271 N.W.2d 619.)

---

† Motion for reconsideration denied, without costs, on January 30, 1979.

For the appellant the cause was argued by *Jack E. Schairer*, assistant state public defender, with whom on the briefs were *Howard B. Eisenberg*, state public defender, and *Robert J. Paul*, deputy state public defender.

For the respondent the cause was argued by *Michael R. Klos*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

BEILFUSS, C. J.   As stated above, this is an appeal from an order which denied a postconviction motion made pursuant to the provisions of sec. 974.06, Stats. [1]

In defining the scope of this motion this court in *Peterson v. State*, 54 Wis.2d 370, 381, 195 N.W.2d 837 (1972), [2] said:

---

[1] "974.06 *Postconviction procedure.* (1) A prisoner in custody under sentence of a court claiming the right to be released upon the ground that the sentence was imposed in violation of the U.S. constitution or the constitution or laws of this state, that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"(2) A motion for such relief is a part of the original criminal action, is not a separate proceeding and may be made at any time. The supreme court may prescribe the form of the motion."

[2] *See also Loop v. State*, 65 Wis.2d 499, 222 N.W.2d 694 (1974); *State v. Langston*, 53 Wis.2d 228, 191 N.W.2d 713 (1971); *Carrillo v. United States* (10th Cir. 1964), 332 F.2d 202.

"The postconviction motion under sec. 974.06, Stats., is not a substitute for a motion for a new trial. A sec. 974.06 motion can be made only after the defendant has exhausted his direct remedies which consist of a motion for a new trial and appeal. A sec. 974.06 motion is limited in scope to matters of jurisdiction or of constitutional dimensions. . . Such issues as sufficiency of the evidence, jury instructions, error in admission of evidence, and other procedural errors cannot be reached by a sec. 974.06 motion."

The defendant has raised several issues with respect to the admission of evidence, instructions to jury and other trial errors. Despite the defendant-appellant's contention to the contrary, these alleged errors are not errors of constitutional proportions; accordingly they will not be reached in this opinion. To simply label an alleged procedural error as a constitutional want of due process does not make it so.

Our primary concern in this opinion will be with the admissibility of several statements or admissions made by the defendant to law enforcement authorities.

The necessary facts are as follows:

This action was commenced on December 7, 1973, by the filing of a complaint. It charged that defendant Donald Schlise in concert with James Brown as a party to a crime caused the death of Irene Schlise with intent to kill contrary to secs. 939.05 and 940.01, Stats. On December 18, 1973, an amended criminal complaint was filed asserting that Donald Schlise acted in concert with James Brown and Sam McGhee.

On January 28, 1974, a preliminary examination was commenced in the County Court of Waukesha county. Part-way through the presentation of the state's evidence, defense waived the right to a preliminary. The defendant was then bound over for trial.

An information dated January 30, 1974, was filed charging defendant with first-degree murder as party to a crime. The information also contained the statement that stipulated that defendant's plea of not guilty and not guilty by reason of insanity be withdrawn and a plea of not guilty be substituted.

A defense motion for change of venue was heard before then Judge WILLIAM G. CALLOW and denied March 14, 1974.

On March 20, 1974, a motion to suppress and various other pretrial motions dated March 18, 1974, were filed. A hearing on the motions was held May 7, 1974 before Judge CALLOW. The suppression motion was denied by written order entered on May 8, 1974.

In view of the fact that Judge CALLOW was by that time scheduled to preside over the trial of Sam McGhee for a crime arising out of the same incident, the judge was disqualified on his own motion and Judge ANDREW P. COTTER was substituted.

Judge COTTER granted a renewed request for change of venue on September 25, 1974, and the cause was transferred to the County Court of Marquette county in Montello.

A trial by jury was held from October 14, 1974 through October 19, 1974. Defendant was found guilty of first-degree murder as party to a crime. A judgment of conviction in accordance with the verdict was entered on October 21, 1974, and defendant sentenced to life imprisonment.

Postconviction procedural progress of the cause is confused. Several orders extending the time for filing and determining postconviction motions were issued—some pursuant to defense motion, some per stipulation.

Finally defendant's sec. 974.02[3] motions to set aside the judgment or for an order granting a new trial were

[3] "974.02 *New trial*. (1) In felonies, a defendant may move in writing or with the consent of the state on the record to set aside a judgment of conviction and for a new trial in the

submitted, alleging trial court error in denying the motion to suppress, in refusing to submit certain requested jury instructions, and in admitting irrelevant and inflammatory evidence. On May 9, 1975, after a hearing, the trial court entered a written order denying the motions.

On August 6, 1975, notice of appeal from the judgment of conviction and sentence and from the order denying the sec. 974.02 motions was filed. This appeal was not timely pursued and is not before us.

On June 10, 1976, defendant filed a pro se sec. 974.06 motion for postconviction relief alleging that his plea of not guilty and not guilty by reason of mental defect was withdrawn without his knowledge or consent. On November 15, 1976, an amendment to defendant's postconviction motion was filed by counsel. A hearing on the amended motion was held before the trial court on April 14, 1977. On September 27, 1977, an order was issued denying the motion. It is from that order that defendant appeals.

A joint *Miranda-Goodchild* hearing was held on defendant's motion to exclude "any statements made by the defendant while he was in police custody or under their direct control and supervision and restrained of his liberty before and after his arrest. . . ." This motion was heard by Judge CALLOW prior to his disqualification.

Testimony was adduced from Officers Buechler, Zimmerman and Paddock (all of the Waukesha County Sheriff's Department) concerning four separate statements

interest of justice, or because of error in the trial or because of error in the jury instructions, or because the judgment of conviction is not supported by the evidence or is contrary to law, or based on newly discovered evidence; but such motion must be made, heard and decided within 90 days after the judgment of conviction is entered, unless the court by order made before its expiration extends such time for cause. . . ."

given by defendant Schlise to law enforcement authorities.[4]

The first of the four statements under consideration was made in the early morning hours of December 8, 1973, at the Chenequa Police Station. It contained no confession and was ultimately repudiated by Schlise in his final statement. Briefly, this statement declared that defendant spent the morning of December 7, 1973, shopping with his wife, ate lunch with her, left her and went to his office at about 2 p.m., left his office to pay a call on a client after 6 p.m., arrived at Harry Deja's tavern at approximately 7:15 p.m., stayed there until 9:45 or 10 p.m., went home, and discovered the body of his wife.

___

[4] In fact, there was a fifth statement, not an issue at the hearing, which was the first statement made by Schlise to Officer Pucci at the scene of the crime on December 7, 1973. This statement did not contain a confession. It should be noted that prior to questioning Schlise, Pucci read him a *Miranda* warning card and had him sign the waiver section. The full card read as follows:

"There is a chance that you will be charged with a crime and since that is the case there are certain constitutional rights that you have that must be protected. No. 1, you have the right to remain silent in the face of any questions that might be put to you; No. 2, you have the right to be represented by an attorney at all stages of the proceedings that will be had against you including this proceeding right now; No. 3, if you do not have funds to hire an attorney one will be appointed by the Court to represent you; No. 4, I must warn you that anything you say can and will be used against you in a court, if this case goes to court; No. 5, if you decide to answer questions or make a statement and at any time you decide you don't want to answer any further questions or make any further statements you have the right to stop." Turning the card over, it states: "I have had my constitutional rights explained to me and have read the statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want an attorney and know what I am doing. No promises or threats have been made to me, no pressure or coercion of any kind has been used against me."

Additionally, defendant, in response to a question, declared he would be willing to take a lie detector test regarding the statement.

Detective Buechler, prior to taking the statement, advised Schlise of his constitutional rights by asking him the questions set out on the written waiver form. Buechler's questions and Schlise's answers are as follows:

"Q. Do you know that your constitutional rights permit you to remain silent and to make no self-incriminating statements?

"A. Yes.

"Q. Do you know that your constitutional rights require you to be advised that any statements you do make may be used against you in case of a trial?

"A. Yes.

"Q. Do you know that it is your constitutional right to be represented by an attorney during this interrogation and before and during the giving of any voluntary statements you wish to give?

"A. Yes.

"Q. Do you realize if you cannot afford an attorney you can be taken before a Court and an attorney may be appointed for you if you are found to be indigent?

"A. Yes, sir.

"Q. Do you wish to waive your right to have an attorney present?

"A. Yes.

"Q. Acknowledging that you have been freely informed as to your constitutional rights in this matter, do you still wish to make a voluntary statement?

"A. Yes.

"Q. Do you clearly understand each of the above questions?

"A. Yes.

"Q. Do you read, write and understand the English language?

"A. Yes.

"Q. Have any threats or promises been made to you in order to induce you to give a statement by any law enforcement officer, police officer or investigating detective?

"A. No.

"Q. Have you been unreasonably deprived of food or sleep since you have been in custody by any law enforcement officer, police officer or investigating detective?

"A. No.

"Q. Have you consumed any narcotic or liquor of any nature within the past 12 hours? If so, how much?

"A. No.

"Q. Are you under a doctor's care at the present time?

"A. No."

In addition, on cross-examination Buechler testified that Schlise was advised he could stop the interrogation at any time.

The second statement was taken on December 15, 1973, at the State Crime Laboratory in Madison about twenty minutes after defendant completed his polygraph test.

Officer Zimmerman testified that Officer Buechler read the rights from the face of the statement form set forth above. No caution regarding defendant's right to cease answering was given. With regard to ascertaining Schlise's ability to understand the form question, Zimmerman declared he was questioned concerning what he did in real estate and what was involved in obtaining a real estate license. This statement took about thirty minutes to make.

The third statement was also taken on December 15, 1973, on defendant's return to Waukesha from Madison. Officer Buechler indicated that this statement was taken because Schlise stated he had a few things he wanted to add to the statement taken at the Crime Lab. This was corroborated by Zimmerman. Buechler testified that he did not readvise defendant of his constitutional rights, but merely read the typewritten language in the form:

"I, Donald Schlise, have been informed of my rights under the Constitution of the United States of America by Robert Zimmerman and I hereby make the following statement of my own free will and accord without there

having been made to me either threats or promises and knowing that anything I say may be used against me, I do say as follows: . . . ."

He further stated that he did not believe either he or Officer Zimmerman advised Schlise that he had the right to stop the interrogation at any time. However, Officer Zimmerman stated that prior to taking the supplementary statement he advised defendant that "he had the right to remain silent; anything he said could and would be used against him in case this matter went to court; he had the right to have an attorney present before, during or at any time that the statement was being taken; that he had the right to remain silent and that he could stop the questioning or refuse to answer any question he wished to refuse to answer."

The fourth statement was taken on December 16, 1973, at the district attorney's office in Waukesha. The procedure took several hours. The defendant appeared normal, not tired or confused, according to testimony by Officer Zimmerman. The district attorney advised defendant of his constitutional rights using the statement form as a guide. However, the defendant was not specifically told he had the right to stop the interrogation at any time.

The statement of December 16, 1973, contains the most complete statement of defendant's account of the conspirators' plan and the circumstances surrounding the murder of Mrs. Schlise. The state's brief contains a concise summary of the confession, which covers a period of several months from the summer of 1973 until a week after the murder:

"The defendant stated that in the early summer of 1973, he decided to procure some person to kill his wife. He visited a tavern called the Early Bird in Milwaukee where he met two individuals named William Mills and James Brown. They met several times and discussed how the murder should be accomplished. After Mills re-

ceived $700 from the defendant on one occasion he disappeared completely from the scene. The defendant then met with James Brown who told him that he would arrange for a third person to perform the killing and that the contract would cost $2500.

"On or about November 15, 1973, the defendant met James Brown in the city of Milwaukee where he was introduced to the man who was to do the actual killing, Sam McGee [sic]. On December 4, 1973, the defendant drove Sam McGee to his residence in the Town of Merton. The two men went out to the Schlise residence again on December 5 and December 6, 1973. The defendant showed Sam McGee how he could drive his car through an open field behind the house and park next to a corn crib in order to escape detection. The defendant pointed out that McGee could gain entrance to the house through the door leading from the garage. The defendant gave McGee a diagram of the interior of the house and a house key to the door leading from the garage. The weekend of December 7–9, 1973, was set for the killing.

"On the morning of Friday, December 7, 1973, the defendant called Sam McGee and told him that the 'job' should be performed that night. The defendant met McGee that evening about 6:30 p.m. to confirm the final arrangements. The conspirators had discussed how the killing should be covered up by a fake robbery. On the diagram of his residence, the defendant marked where a cash box would be located in the master bedroom. When the defendant arrived home that evening about 9:30 p.m. he discovered his wife's body lying next to the door which allowed entrance from the garage. The evidence also established that the defendant knew that his daughter Sherry was away from the family residence every Friday night from approximately 6:00 p.m. to 12:00 p.m. on a babysitting assignment.

"On December 8, 1973, the defendant met Sam McGee and handed over the sum of $1,870 in cash. It was agreed that the balance on the contract would be paid in two or three weeks. On December 10, 1973, James Brown called the defendant at his office and told him to meet Brown and McGee at a Sears store. They asked for the remaining sum of $600.00 and an additional $300.00 so they

could leave town. The defendant agreed. He went to his son's home, Harold Schlise, and wrote out a check for $800.00 to Harold as payee and then drove Harold's wife to the bank where the check was cashed. He met with Brown and McGee again on December 12 or December 13, 1973, and handed over $900.00 in cash. The defendant told the two men that the Sheriff's Department had discovered a knife. McGee told him not to worry because there was no fingerprints on the knife or in the house."

Mr. Anderson, the polygraph examiner, did not appear at the suppression hearing; neither was a transcript of Schlise's oral statement to Anderson produced. Counsel disagreed about whether there had been a prior agreement that Anderson would not be present. The court found that there was no stipulation to that effect.

Durward Baker, psychiatrist, examined Schlise three separate times for a total of three hours. The interviews took place around the end of February. Baker testified that he believed Schlise during the period following December 8th and up to the date he [the doctor] saw him was "in a significant depression," and "mental illness." This depressed state, coupled with his guilt, his lack of education, and certain personality traits, rendered defendant, in Dr. Baker's opinion, unable to knowledgeably waive his rights. On cross-examination, the doctor stated that defendant's depression dated from about six months prior to the February interviews. He also admitted that his opinion was based about 50 percent on the patient's own self-expressed history, and 50 percent on clinical observation.

Dr. Samuel Friedman, clinical psychologist, based his professional opinion on two interviews and four tests at the end of March, 1974. The test scores placed defendant in the average to high average range of intelligence with average perceptual functioning. The personality tests revealed Schlise to be a "seriously depressed, anxious

and withdrawn" person, who at the time of testing had considerable guilt and anxiety. Friedman was of the opinion that Schlise was depressed for much longer than the six-month period suggested by Baker. Based on his observations of defendant at the hearing, Friedman thought Schlise had improved. However, his professional opinion was that during the period of December 8th to the 16th Schlise lacked the capacity to act in a free and voluntary manner.

Schlise testified briefly concerning the circumstances surrounding the giving of the four statements: Contrary to the testimony of Buechler above, defendant declared that on December 8, 1973, no rights were read other than those set out on the waiver form, missing the right-to-stop caution. He partially understood the questioning. He further testified that on all occasions he didn't pay much attention to the questions. For the statement on December 15, 1973, he was tired and felt a lot of pressure. However, it was brought out on cross-examination that Schlise was given time to collect his thoughts with paper and pencil.

Judge CALLOW denied the motion to suppress. He concluded that the constitutional warnings given Schlise were sufficient and that the statement under the totality of circumstances appeared knowledgeable and voluntary. These findings and conclusions are not contrary to the great weight and clear preponderance of the evidence before the trial court and in the absence other factors to be discussed below would foreclose further consideration.

At the trial the state adduced testimony from James Brown, Sam McGhee [taken from transcript of McGhee trial], and Billy Mills that defendant had discussed killing his wife and had also paid money to them at different times for this purpose. Brown testified that he rode with Schlise and Billy Mills to see the Schlise home, for the purpose of killing Schlise's wife. Brown further testified that Thursday, December 13, 1973, he, Schlise,

and Sam McGhee met at the Sears restroom where Schlise gave $300 to Brown and $600 to Sam McGhee. On the preceding day, Brown testified, Schlise told McGhee that the police had found the knife and gloves and that he "wasn't going to take the weight alone." However, all three men denied responsibility for the actual killing, claiming they were only trying to get money and had no intention of following through on Schlise's offer.

Although it was established that Irene Schlise was stabbed to death, no forensic evidence was found that could tie any particular person to the crime.

Police officers were called to testify concerning the statement taken from Schlise. Officer Thomas Pucci summarized the complete *Miranda* warnings he gave defendant at the scene and explained he had Schlise sign the warning card to indicate he understood the cautions. Officer Buechler repeated the cautions he gave Schlise the morning of December 8, 1973, which did not contain the right-to-stop warning. Evidence adduced at the motion to suppress hearing was repeated, regarding the warnings given and the circumstances surrounding the taking of the December 15 and 16 statements.

A critical portion of the trial for purposes of this appeal is the testimony of Robert Anderson, Chief Polygraph Examiner at the State Crime Laboratory in Madison. Almost immediately after this witness took the stand, defense objected to his testimony on two grounds: first, the interview of Schlise by Anderson was a part of the polygraph test itself and therefore should be excluded absent a stipulation pursuant to *State v. Stanislawski*, 62 Wis.2d 730, 216 N.W.2d 8 (1974); second, no determination of voluntariness had been made with specific respect to the statement, which in fact posed serious voluntariness questions.

A conference was called with the judge and counsel. After recess to examine the suppression record, the court

concluded that Judge CALLOW had "considered all matters that were before him" before finding defendant's statements were voluntarily made. The court further reasoned that defendant had in fact had Anderson's testimony available to him at the time of the original *Goodchild* hearing because of the state's open file policy. Therefore, the court was of the opinion that the previous *Goodchild* hearing covered the Anderson testimony and that the requisite finding of voluntariness had already been made. Defendant's motion for a mistrial on the ground that the statement was not tested as to voluntariness was denied.

Over defendant's objection, then, Anderson's testimony was received. Anderson explained that prior to administering the polygraph test he read Schlise his rights and had Schlise explain to him what they were. The cautions included the fact that defendant had the right to stop at any time. This reading was witnessed by Officers Zimmerman, Buechler and the district attorney from the other side of a two-way mirror.

In the post-test interview Anderson persuaded Schlise to talk about the death of his wife. Defense asserts that Anderson's coercive interrogation techniques broke down Schlise's resistance and resulted in a statement that was not voluntarily given. An example of the type of questioning the defense finds objectionable:

"The first chart, right, we concluded basically four things. OK. Number one, you did ask someone to kill your wife, OK, we concluded that. We also concluded that you hired someone to harm her. OK, this is sort of a secondary relevant issue concerned with the set up. And we also concluded one other thing. Do you know for sure who killed Irene. We concluded those three things. Now Don, I've been involved in this type of work for a long time and there's always two sides to every story. OK. What I don't know right now for sure I know you contracted with someone to kill, not necessarily kill your wife, but to harm her. Sometimes when you make up a

contract like this things go a little bit wrong and sometimes maybe you had no intentions of say, really killing your wife when you hired this guy but what happened he went a little bit too far and she died. Now I don't know for sure at this point whether that's what happened or in fact you actually did ask this person to kill her. Don, again, many many things cause this. It can be caused from an unhappy marriage. It can be caused from pressure at home, pressures at work. In other words, what I'm saying is sometimes you get up in the morning and you touch something and everything just sort of turns to shit, doesn't it. I think we all have these days. Don, I can look at you now and some of the visual signs are beginning to really set in, the dryness of the mouth, the dilation of the eyes, you've got a lot on your mind now, the thing is Don that to get some psychological and also physical relief from this I would suggest now that you start telling the truth. Tell me exactly what happened, how this thing got started."

"Sure, OK, that's what I want you to be. Now, Don I also feel that you wanted to dispose of your wife from looking at your charts and I think right now you're rationalizing a little bit."

"Now wait a minute, Don, before you say too much more and get yourself out on a limb, I know you're not being truthful and I'll tell you why. Some of the names I read to you we know you talked to, OK?"

"Sure, we know you talked to them, and we know that the initial contact back in July and August was to kill your wife, OK? One of these individuals has already come forward, and given a complete statement and this is the reason you're down here. So we can more or less verify to see if he's telling the truth."

After Anderson's testimony the court, out of hearing of the jury, explicitly found the statement of Schlise to Anderson was voluntarily given.

We conclude that it was prejudicial error to receive the testimony of the polygraph examiner, Robert Ander-

son, because a pre-examination stipulation as required by *State v. Stanislawski*, 62 Wis.2d 730, 216 N.W.2d 8 (1974), was not entered into by the parties. Not only the polygraph evidence and the examiner's opinion of the significant conclusions to be drawn therefrom, but also his testimony concerning the post-mechanical interview should be excluded.

This is not intended to suggest that all post-examination interviews between a subject and the examiner will be subsumed into the special category of polygraph evidence and fall within *Stanislawski*. *Turner v. State*, 76 Wis.2d 1, 250 N.W.2d 706 (1977), and *McAdoo v. State*, 65 Wis.2d 596, 223 N.W.2d 521 (1974)—both involving the very examiner whose techniques and testimony are again questioned here—are clear authority for the opposing view, *i.e.*, that in certain factual settings such interviews may be found to be totally discrete from the examination which precedes them. It should be noted, in this regard, that the Anderson interview at issue in *Turner* took place six days after the polygraph test. In *McAdoo* the interview followed the test almost directly. However, this court in *McAdoo* at 603, made the specific determination that it appeared from the record that the test was over, that defendant was informed the test was over, and that he was freely conversing with the examiner.

The present case is distinguished from *Turner* and *McAdoo* on its facts. No evidence appears in the record regarding whether defendant was aware of—or even informed of—the fact that the interview with Anderson was not another phase of the polygraph examination. The fact that defendant was not connected to the machine at the time is not conclusive because the "mechanical" part of the test was preceded by a lengthy pre-test interview assumed by all parties to be part of the polygraph

examination. Furthermore, in eliciting the oral statement at issue here, Anderson made frequent use of and reference to the charts and tracings he had just obtained. Even more telling, Anderson himself in this case considered the "mechanical" test and the subsequent interview to be two parts of one unified procedure. The exchange between defense counsel and Mr. Anderson at the trial reveals this:

"A. The total time that Mr. Schlise was with me was about 3 hours and 20 minutes.
"Q. The portion that refers to your asking him questions and him giving you answers consists of how much time relative to 3 hours and 20 minutes?
"A. Are you asking me now concerning the questions about his wife?
"Q. I'm asking you in reference to the questions you asked and the answers, if any, he gave that are recorded. . . .
"A. Fifty-six minutes.
"Q. So the balance of the time would be involved in other proceedings that were part of your interview as you call it.
"A. That's correct, sir.
" . . .
"Q. This is one entire test, however, is it not an interview if I may use that word?
" . . .
"Q. What I'm saying to you, Mr. Anderson, the portion of time asking specific questions and obtaining specific answers is a part of the entire interview, is it not, as we have used that term?
"A. Yes, it is.
"Q. In other words what preceded that 56 minutes is no more or less a part of this interview than that statement involved in questions and answers, isn't it?
"A. I would have to answer that it's all one."

The post-mechanical interview was so closely associated with the mechanical or electronic testing, both as to time and content, that it must be considered as one event and

because of the lack of a *Stanislawski* stipulation excluded from the evidence.

Because we have concluded that the statements made by the defendant to the polygraph operator in their entirety must be excluded from the evidence upon a new trial, the voluntariness of such statements need not be considered except to the extent they may have influenced the subsequent statements given by the defendant to the law enforcement officials.

Defendant contends that the techniques used by polygraph examiner Anderson in the course of his post-polygraph test interview were improper and coercive, and that the resulting confession given by defendant to Anderson was involuntary. Clearly, the question of whether a confession was freely given or coerced does not depend solely on whether the defendant was subjected to physical mistreatment.

"The question in each case is whether a defendant's will was overborne at the time he confessed. [Cases omitted.] If so, the confession cannot be deemed 'the product of a rational intellect and a free will,' Blackburn, supra, at 208 [*Blackburn v. Alabama*, 316 U.S. 199 (1960)]. In resolving the issue all the circumstances attendant upon the confession must be taken into account. [Cases omitted.] Physical mistreatment is but one such circumstance, albeit a circumstance which by itself weighs heavily. But other circumstances may combine to produce an effect just as impellingly coercive as the deliberate use of the third degree." *Reck v. Pate*, 367 U.S. 433, 440–441 (1961).

In the present case the record reveals that the voluntariness of the confession to Anderson was neither put before the court by the parties nor addressed by the court of its own initiative during the pre-trial *Goodchild* hearing. However, after Anderson's testimony at trial the court, out of the jury's hearing and over defense objec-

tion, found that the statement of Schlise to Anderson was voluntarily made.

The defendant further argues that the three subsequent confessions given to law enforcement officials were similarly involuntary and should have been excluded as the fruit of the tainted first polygraph-related statement. A *Goodchild* hearing was held on these statements. However, in determining whether these confessions were "the product of a rational intellect and a free will," Judge CALLOW did not consider whether the earlier confession to Anderson was in fact the product of coercion and, if so, whether the later confessions were sufficiently independent from this involuntary confession to be free of the coercive atmosphere which fatally infected it. Neither party introduced a transcript of the oral statement given to Anderson. Nor was Anderson called to testify.

The "fruit of the poisonous tree" doctrine is most commonly applied in a fourth amendment and the exclusionary rule context in order to bar the admission in a criminal case of evidence derived from information obtained in the course of an unlawful search and seizure. However, in its broadest sense, the rule can be regarded —and has in fact been applied—as a device to prohibit the use of any secondary evidence which is the product of or which owes its discovery to illegal government activity.[5]

In *United States v. Bayer,* 331 U.S. 532, 540–541 (1947), the United States Supreme Court dealt with the admissibility of a confession made six months after the original inadmissible, coerced one. The court made this declaration:

"Of course, after an accused has once let the cat out of the bag by confession, no matter what the inducement, he is never thereafter free of the psychological and prac-

---

[5] For illustration and discussion of such applications see 43 A.L.R.3d 385 (1972), and Pitler, " 'The Fruit of the Poisonous Tree' Revisited and Shepardized," 56 Cal. L. Rev. 579 (1968).

tical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first. But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed. The Silverthorne and Nardone Cases, relied on by the Court of Appeals, did not deal with confessions but with evidence of a quite different category and do not control this question."

We believe the issue of admissibility of a statement should be determined by fundamental voluntariness concepts and not on the "poisonous tree" rule. It may be contended that this is to paint with too fine a legal brush. As a practical matter, involuntary statements will be found to be fruits of the prior coerced one and voluntary statements will not be. However, phrasing the question in terms of voluntariness is a more direct approach which provides a practical indication of the kind of evidence a court should consider relevant to the ultimate issue of the admissibility of the later confessions. As the Supreme Court declared in *Lyons v. Oklahoma,* 322 U.S. 596, 603 (1944) :

"The Fourteenth Amendment does not protect one who has admitted his guilt because of forbidden inducements against the use at the trial of his subsequent confessions under all possible circumstances. The admissibility of the later confession depends upon the same test—is it voluntary."

The fact that an initial confession has been induced by improper or coercive means does not permanently foreclose the possibility of later obtaining a valid statement.[6]

---

[6] *United States v. Bayer,* 331 U.S. at 541.

The rule in Wisconsin regarding the admissibility of subsequent confessions—of early vintage—follows the general rule. *Lang v. State,* 178 Wis. 114, 126, 189 N.W. 558 (1922), provided the following concise summary:

"In determining whether the later confessions should be received the rule to be applied is thus stated in Corpus Juris:

" 'Although a confession may have been obtained by such means as would exclude it, a subsequent confession of the same or like facts may and should be admitted, if it appears to the court, from the length of time intervening or from other facts in evidence, that the influence of the promise or threat had been removed. But where a confession has been obtained under circumstances rendering it involuntary and inadmissible, a presumption exists that any subsequent confession arose from a continuance of the prior influence, and this presumption must be overcome before the subsequent confession can be received in evidence. The controlling influence which produced the prior confession is presumed to continue until its cessation is affirmatively shown, and evidence to overcome or rebut this presumption must be very clear, strong, and satisfactory; if there is any doubt on this point the confession must be excluded.' 16 Corp. Jur. 722, 723.

"This statement of the law is sustained by many authorities. *Flamme v. State,* 171 Wis. 501, 177 N.W. 596; *Thompson v. Comm.* 20 Gratt. (Va.) 724; *State v. Drake,* 82 N.C. 592; *People v. Johnson,* 41 Cal. 452; *State v. Brown,* 73 Mo. 631; *Deathridge v. State,* 33 Tenn. 75; *Mackmasters v. State,* 82 Miss. 459, 34 South. 156; *Smith v. State,* 74 Ark. 397, 85 S.W. 1123; *Comm. v. Sheets,* 197 Pa. St. 69, 46 Atl. 753. See cases cited in 16 Corp. Jur. p. 723, sec. 1481."

In that case this court held it was error to admit a second confession made at defendant's initial appearance before the municipal court, since "the controlling influence which exacted the first confession had not been removed when defendant entered his plea of guilty." The court

cited several determinative factors: the brief lapse of time, less than 24 hours, between the later confession and first coercive one; the presence of the policeman who had induced the original confession by physically abusing the defendant; the lack of fifth amendment cautions; defendant's legitimate fear that repudiation would lead to further physical mistreatment; and defendant's weakened moral, intellectual and physical condition.

The voluntary or involuntary character of a later confession, like that of the original one, is determined from the totality of the surrounding circumstances. Of course the fact that the original statement was obtained by coercion is one of the surrounding circumstances to be weighed in appraising the voluntariness of the later one.[7]

In *Lyons v. Oklahoma, supra,* the Supreme Court held that a later confession was admissible although it was separated by only twelve hours from an earlier statement admittedly obtained by physical abuse. The court specifically relied on the following evidence: the confessions were separated by "a full twelve hours"; the later confession followed defendant's transfer from the control of the sheriff under whose authority he had been mistreated to that of the warden; evidence indicated that the defendant confessed without a show of threats and after being warned of his rights not to incriminate himself; and the defendant did not appear cowed in his conversational exchanges with the warden.

---

[7] *See Lyons v. Oklahoma,* 322 U.S. 596 (1944); *United States ex rel. Weber v. Ragen,* 176 F.2d 579 (C.A. Ill. 1949), cert. dismissed 338 U.S. 809; *Lisenda v. California,* 314 U.S. 219 (1941); *Leyra v. Dennon,* 347 U.S. 556 (1954); Clewis v. Texas, 386 U.S. 707 (1967); *Beecher v. Alabama,* 389 U.S. 35 (1967).

There are few Wisconsin cases on this issue. Other than *Lang v. State,* 178 Wis. 114, 189 N.W. 558 (1922) — *Jones v. State,* 184 Wis. 50, 198 N.W. 598 (1924), should be noted. The case involved the admissibility of two confessions: the first made at the police station after a beating by a police officer; the second, made later the same day in the office of the district attorney. This court's language regarding the admissibility of the second statement is revealing:

"Our judgment is that, in view of the fact that the confessions were made so soon after those in the police station and were made in the presence of Slivenick, who had inflicted physical punishment upon the defendants only a short time before, they were not admissible in evidence. In so ruling we are not unmindful of the fact that the district attorney informed the defendants of their constitutional rights, and told them they were under no obligation to make any statements and that if they made any such statements they would be used against them. The district attorney did all he could to safeguard the rights of the defendants and no blame attaches to him. We feel that in spite of his caution there was a sufficient residuum of duress remaining, especially with Slivenick present, to make the confessions involuntary and incompetent in evidence, and upon the new trial they should be excluded." *Jones v. State,* 184 Wis. at 54–55.

We reverse and set aside the conviction and remand for a new trial because of the prejudicial receipt in evidence of the results of the polygraph examination and the post-examination statements which we conclude were all a part of a single examination. We further conclude that upon the remand for a new trial upon proper motion by the defendant, another *Goodchild* hearing should be conducted to determine whether the post-mechanical phase of the polygraph examination was so

psychologically coercive as to render the defendant's admissions involuntary, and whether the subsequent statements were voluntary or so tainted by the prior statement to Anderson (if it was) so it cannot be said they were freely and voluntarily given.

One more issue raised by the defendant deserves comment. The defendant contends his original plea of not guilty by reason of mental disease or defect was withdrawn by counsel without his consent. This contention is not supported by the record. Defense counsel testified at the postconviction hearing that he had discussed the psychiatrists' recommendations against such a plea. At a pretrial conference where defendant was present, counsel informed the court he did not intend to pursue the insanity issue. When defense counsel advised the trial court on the record that the plea would be withdrawn, defendant was present and made no objection. There is nothing to suggest that counsel was not speaking for defendant at that time.

*By the Court.*—Order reversed and judgment and conviction set aside and remanded for a new trial not inconsistent with this opinion.

CALLOW, J., took no part.