STATE of Wisconsin, Plaintiff-Respondent, †

v.

Joseph PICKETT, Defendant-Appellant.

Court of Appeals

*No. 88–0824–CR. Submitted on briefs January 3, 1989.—Decided May 4, 1989.*

(Also reported in 442 N.W.2d 509.)

For the plaintiff-respondent the cause was submitted on the briefs of *Donald J. Hanaway,* attorney gen-

---

† Petition to review denied.

eral, and *Maureen A. McGlynn,* assistant attorney general.

For the defendant-appellant the cause was submitted on the briefs of *Michael S. Sperling,* of Milwaukee.

Before Moser, P.J., Sullivan and Fine, JJ.

FINE, J. Joseph Pickett appeals from a judgment of conviction entered on jury verdicts finding him guilty of five counts of second degree sexual assault involving intercourse with a fourteen-year-old girl in violation of sec. 940.225(2)(e), Stats. (1985–1986).[1] The trial court sentenced Pickett to the maximum period of incarceration: five consecutive indeterminate terms not to exceed ten years each.

The issue raised by this appeal concerns whether the trial court properly permitted a polygraph examiner to testify on rebuttal that Pickett made inculpatory nods in response to the examiner's questions posed after completion of the polygraph examination. There was no error and we affirm.

## I.

Pickett voluntarily took a polygraph examination administered by a lieutenant in the Milwaukee County Sheriff's Department. At the time, Pickett had not been charged and he was not in custody. Contending that Pickett had made a number of admissions after the polygraph examination was over, the prosecutor alerted the trial court and defense counsel that he would seek to use those admissions on rebuttal to attack Pickett's credibil-

[1] Section 940.225(2)(e), Stats., was repealed by sec. 30, 1987 Wis. Act 332, effective July 1, 1989. The provision was revised as sec. 948.02(1) and (2), Stats., which was created by sec. 55, 1987 Wis. Act 332.

ity should he testify. After the state rested, the trial court held a hearing outside of the jury's presence to determine whether Pickett made the responses attributed to him and, if so, whether they were voluntary. *See State ex rel. Goodchild v. Burke,* 27 Wis. 2d 244, 133 N.W.2d 753 (1965), *cert. denied,* 384 U.S. 1017 (1966).

Both Pickett and the lieutenant testified at the hearing, but they gave conflicting versions of what happened. Pickett testified that his attorney directed the lieutenant not to ask any questions other than those that had been disclosed to the defense prior to the examination and that the lieutenant agreed. The lieutenant, however, denied that Pickett's attorney had requested that Pickett not be asked additional questions. He also denied that the attorney had asked him not to question Pickett after completion of the polygraph test. The lieutenant noted that he would have complied with the requests if they had been made.

The lieutenant explained the procedure he followed in administering the test to Pickett. After an hour of preliminaries, designed to make the person being tested feel at ease, Pickett was connected to the machine and was told how it worked. Additionally, Pickett was given his warnings under *Miranda v. Arizona,* 384 U.S. 436 (1966), and signed a statement waiving those rights as well as agreeing to the test. He acknowledged, by signing the consent form, that he knew he was free to leave the examination room at any time.

The actual polygraph examination took approximately four to six minutes and was run three times. After the conclusion of the test, the lieutenant told Pickett the results of the test. The lieutenant concluded that Pickett "was attempting deception" when he denied having sexual intercourse with the fourteen-year-old girl, and he told Pickett that in an attempt to get "him to

admit the truth." According to the lieutenant, after the test was completed, Pickett nodded in the affirmative when asked if he had sex with the young girl, when asked if he was going to tell his lawyer that, and when asked whether he was sorry. At the hearing, Pickett denied making those responses, and denied admitting the assault. "I told him that I had done wrong," Pickett testified, "that I was guilty of abuse but not sexual abuse."

At the conclusion of the hearing, the trial court determined that Pickett nodded affirmatively in response to the lieutenant's questions and that those "statements" were voluntary beyond a reasonable doubt. The trial court indicated it would permit the prosecution to call the lieutenant as a rebuttal witness to testify about the nods as impeachment if Pickett testified to the contrary, but that neither the prosecution nor the defense could mention that the lieutenant's questions were asked in the context of a polygraph examination. The trial court declined to determine whether the lieutenant had been told by Pickett's lawyer not to ask Pickett any questions other than those that had been previewed with the defense, whether the lieutenant had been told by Pickett's lawyer not to ask Pickett any questions other than those that had been previewed with the defense, whether the lieutenant had been told not to interrogate Pickett after the test was finished, and whether the lieutenant had agreed to those restrictions. The trial court concluded that these issues were not relevant.

Pickett took the witness stand in his own defense. On direct examination, he denied ever having sexual intercourse with the fourteen-year-old girl. On cross-examination, Pickett was asked about his conversations with the lieutenant. He denied nodding his head affirma-

tively when asked whether he had sexually assaulted the young girl and when asked whether he was sorry for having done so. The lieutenant testified on rebuttal and contradicted Pickett's denials. The trial court instructed the jury that the lieutenant's testimony could be considered only for impeachment purposes and not as substantive proof of the facts contained in Pickett's statement.

## II.

The trial court's finding that Pickett nodded affirmatively in response to the post-test questions is historical fact that must be affirmed because it is neither "clearly erroneous," *see State v. Pitsch,* 124 Wis. 2d 628, 634, 369 N.W.2d 711, 714–715 (1985) (citing Rule 805.17(2), Stats.), nor "contrary to the great weight and clear preponderance of the evidence." *See State v. Woods,* 117 Wis. 2d 701, 715, 345 N.W.2d 457, 465 (1984), *writ of habeas corpus granted on other grounds, Woods v. Clusen,* 605 F. Supp. 890 (E.D. Wis. 1985) *aff'd,* 794 F.2d 293 (7th Cir. 1986).[2] Pickett apparently concedes that his post-polygraph interview with the examiner was not coerced or involuntary. Indeed, the trial court found beyond a reasonable doubt that his post-test statements were voluntary. On our independent review of this constitutional fact, *see State v. Fry,* 131 Wis. 2d 153, 171, 388 N.W.2d 565, 573, *cert. denied,* 479 U.S. 989 (1986), we agree.

---

[2] These tests are the same. See *Noll v. Dimiceli's, Inc.,* 115 Wis. 2d 641, 643, 340 N.W.2d 575, 577 (Ct. App. 1983), which interpreted Rule 805.17(2), Stats. Since Rule 972.11(1), Stats., provides, with exceptions not material, that "the rules of . . . practice in civil cases shall be applicable in all criminal proceedings . . .," Rule 805.17(2) is applicable to criminal cases.

Pickett raises three related issues in connection with his claim that his rights were violated when the polygraph examiner was permitted to testify on rebuttal. First, he contends that Wisconsin law, as enunciated in *State v. Schlise,* 86 Wis. 2d 26, 271 N.W.2d 619 (1978), forbids receipt into evidence of post-polygraph statements when the test results are not admissible and those statements are "so closely associated with" the testing that the post-test interview and the actual testing "must be considered as one event." *Id.* at 43, 271 N.W.2d at 627. Second and third, Pickett claims that his constitutional rights to counsel and to due process were violated because the questions were asked despite an alleged agreement between the polygraph examiner and Pickett's attorney that no such questions would be asked. We discuss these points in turn.

### A.

Prior to *State v. Dean,* 103 Wis. 2d 228, 307 N.W.2d 628 (1981), polygraph results were admissible in Wisconsin courts if there was a valid stipulation concerning the examination executed by the prosecution and the defendant, and certain other conditions were met. *State v. Stanislawski,* 62 Wis. 2d 730, 742–743, 216 N.W.2d 8, 14–15 (1974). *Dean* prospectively ruled that polygraph evidence was not admissible unless there was a valid *Stanislawski* stipulation executed on or before September 1, 1981. *Dean,* 103 Wis. 2d at 279, 307 N.W.2d at 653.

Pickett advances the following syllogism. Absent a *Stanislawski* stipulation, *Schlise* required that a post-polygraph interview that "was so closely associated" with the actual test "both as to time and content" that it "must be considered as one event" be excluded from

evidence. *Schlise,* 86 Wis. 2d at 43–44, 271 N.W.2d at 627–628. *Dean's* exclusion of all polygraph evidence is equivalent to a pre-*Dean* situation where there was no *Stanislawski* stipulation. The post-test interview here is of the type excluded by *Schlise.* Therefore, Pickett concludes, the trial court erred in admitting the polygraph examiner's testimony.

Pickett's proposition would have some merit if the polygraph examiner's testimony had been received in the state's case in chief. It was not. The testimony was received in rebuttal to impeach Pickett's denials and the jury was given a proper limiting instruction. This appeal is, therefore, governed by *Harris v. New York,* 401 U.S. 222 (1971), and its progeny. They are dispositive of all the issues Pickett raises.

In *Harris,* the defendant took the stand and denied selling heroin to an undercover police officer. *Id.* at 223. Immediately after his arrest, however, Harris had made statements to the police that were partially contradictory of his later trial testimony. *Ibid.* The pretrial statements were not admissible in the prosecution's case in chief because Harris had not been given his *Miranda* warnings. *Id.* at 223–224. Nevertheless, the trial judge permitted the prosecutor to ask Harris about those statements on cross-examination. When Harris said he could not remember making the statements, the court instructed the jury that the statements could be considered in evaluating Harris' credibility but not as evidence of guilt. *Id.* at 223. The Supreme Court affirmed Harris' conviction noting that the statements, though uncounseled, were neither coerced nor involuntary, *id.* at 224, and that "[t]he shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior

inconsistent utterances." *Id.* at 226. Wisconsin follows *Harris. State v. Mendoza,* 96 Wis. 2d 106, 118, 291 N.W.2d 478, 485 (1980). *See also State v. Schultz,* 148 Wis. 2d 370, 377, 435 N.W.2d 305 (Ct. App. 1988) (statements made by defendant during *Goodchild* hearing admissible to impeach his trial testimony).

The bright-line test recognized by both the United States Supreme Court and Wisconsin in determining whether a defendant's prior inconsistent statements can be used for impeachment is whether those statements have been "compelled." Thus, for example, in *New Jersey v. Portash,* 440 U.S. 450 (1979), the defendant was compelled to testify before a grand jury following a grant of immunity. *Id.* at 459. As a result, his grand jury testimony could not be used as impeachment under the *Harris* doctrine. *Id.* at 458–460. By the same token, in *State v. Thompson,* 142 Wis. 2d 821, 829, 419 N.W.2d 564, 568 (Ct. App. 1987), the defendant was compelled by the threat of loss of liberty to give statements to his probation officer. As a result, those statements could not be used as impeachment under *Harris. Id.* at 833, 419 N.W.2d at 568. Since Pickett's post-polygraph interview was voluntary, the examiner's testimony about Pickett's responses to his questions was admissible as impeachment under *Harris.*

### B.

We now turn to Pickett's assistance of counsel and due process arguments. The trial court declined to rule on whether Pickett's attorney instructed the polygraph examiner not to ask Pickett any questions other than those that had been reviewed by the defense prior to the examination. It also declined to decide whether the examiner had agreed with those alleged conditions. The

trial court reasoned that these matters were not relevant since the sole material issue was whether the "statements" were voluntary. We agree.

Although not decided in the context of a Sixth Amendment right-to-counsel claim, the underlying rationale of *Oregon v. Hass,* 420 U.S. 714 (1975), which added flesh to the *Harris* doctrine, is controlling. Hass was arrested in connection with the theft of bicycles from two residential garages. *Id.* at 715. He was advised of his *Miranda* rights, and made a number of inculpatory statements until finally realizing he "was in a lot of trouble," he asked to call his attorney. *Ibid.* The arresting officer told Hass that he could make the call as soon as they arrived at the police station. *Id.* at 715–716. Hass then told the officer where one of the bicycles was hidden. *Id.* at 716. The trial court admitted this statement as impeachment, and gave an appropriate limiting instruction to the jury, but was reversed by the Oregon appellate courts. The Oregon Supreme Court reasoned that suppression was required even though the statement was only received for impeachment because otherwise the police could gain an advantage by continuing their interrogation after a suspect had invoked his right to counsel. *See id.* at 717–718. The United States Supreme Court reversed, holding that the case was governed by *Harris* since in both cases the defendants testified after they knew that their prior inconsistent statements "had been ruled inadmissible for the prosecution's case in chief." *See id.* at 722. The Court forcefully reaffirmed its earlier *Harris* ruling:

> Here, too, the shield provided by *Miranda* is not to be perverted to a license to testify inconsistently, or even perjuriously, free from the risk of confrontation with prior inconsistent utterances.

> We are, after all, always engaged in a search for truth in a criminal case so long as the search is surrounded with the safeguards provided by our Constitution. There is no evidence or suggestion that Hass' statements to [the arresting officer after Hass said he would like to call his attorney] were involuntary or coerced.

*Ibid.*

As the Supreme Court has recently reiterated, the sanctity of the oath to tell the truth every witness takes must ordinarily be given precedence over competing interests. *See Nix v. Whiteside,* 475 U.S. 157 (1986). Thus, a lawyer may not knowingly permit his criminal defendant client to testify falsely, and this principle overcomes the client's right to counsel and right to present a defense. *See id.* at 162-163, 174-176. *See also Perry v. Leeke,* 109 S. Ct. 594, 601 (1989) ("the truth-seeking function of the trial" outweighs criminal defendant's right to confer with counsel in middle of his testimony during a brief recess).

Although Pickett cites authority in the specific context of the Sixth Amendment right to counsel where statements have been suppressed for impeachment purposes[3] and argues that "fundamental fairness" requires

---

[3] *Bishop v. Rose,* 701 F.2d 1150, 1157 (6th Cir. 1983) (invasion of attorney/client privilege); *United States v. Brown,* 699 F.2d 585, 588-590 (2d Cir. 1983); *People v. Knippenberg,* 362 N.E.2d 681 (Ill. 1977) (invasion of attorney/client privilege, *Harris* not discussed); *People v. Gonyea,* 365 N.W.2d 136, 139-142 (Mich. 1984) (relying solely on Michigan constitution). Compare the dissent's comment in *Schultz,* albeit without citation to authority, that "testimony at a pretrial suppression hearing based on a violation of the defendant's *Miranda* warning rights or in vilation of his fourth amendment rights, and perhaps his sixth amendment right to counsel, may be used to impeach the defen-

reversal, relying on *State v. Bond,* 139 Wis. 2d 179, 407 N.W.2d 277 (Ct. App. 1987) (prosecutor's promise not to prosecute enforced), we conclude, on balance, that the truth-ascertaining function of the trial, and the sanctity of the testimonial oath upon which that function depends, require that Pickett's voluntary responses to the polygraph examiner's questions be admissible for impeachment purposes.

*By the Court.*—Judgment affirmed.

dant if he testifies." *Schultz,* 148 Wis. 2d at 389, 435 N.W.2d at 314 (Sundby, J., dissenting).