**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**October 16, 2019**

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.  **2018AP1051-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. **2016CF889**

**IN COURT OF APPEALS**
**DISTRICT III**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

VANCE D. REED,

   DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Outagamie County:  MARK J. McGINNIS, Judge.  *Affirmed*.

Before Stark, P.J., Hruz and Seidl, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM.   Vance Reed appeals a judgment, entered upon his no-contest pleas, convicting him of two counts of first-degree intentional

homicide. Reed contends the circuit court erred by denying his pretrial motion to suppress DNA evidence and statements he made to law enforcement. Specifically, Reed asserts he was unlawfully stopped and seized before consenting to provide a DNA sample, thus requiring suppression of the DNA evidence and his statements to law enforcement as fruit of the poisonous tree.[1] We reject Reed's arguments and affirm the judgment.

## BACKGROUND

¶2 On September 14, 2016, Harry and Lorraine Brown Bear were found murdered in their home, each having suffered multiple stab wounds. After testing multiple blood samples from the home, the Wisconsin State Crime Laboratory ascertained that DNA recovered from a knife found next to Harry and from blood stains found on the couple's bed next to an empty gun holster came from the same source: a male other than Harry. Given the amount of blood evidence found in the home, law enforcement determined they would ask for consent to provide a DNA sample when speaking with anyone who had been inside the home or who had other connections to the Brown Bears.

¶3 During the course of their investigation, officers sought to interview then nineteen-year-old Reed and his brother, Desmond Hill, as they lived "less than 150 yards" from the Brown Bear residence. After failing to make contact with the brothers at their home, their mother informed the officers that the brothers were together at Merlin Metoxen's home, which was located "less than a minute"

---

[1] "[I]n its broadest sense, the [fruit of the poisonous tree doctrine] can be regarded ... as a device to prohibit the use of any secondary evidence which is the product of or which owes its discovery to illegal government activity." *State v. Schlise*, 86 Wis. 2d 26, 45, 271 N.W.2d 619 (1978).

away. At Metoxen's house, officers encountered and spoke to Jonathan Melchert and Metoxen in the driveway.[2] The officers learned that Reed, Hill and Peter Penaass were in the house and, at the officer's request, Metoxen asked the three men to come outside.

¶4 Outagamie County Sheriff's Sergeant Travis Linskens spoke to Reed in the driveway for approximately fifteen minutes, while Hill was interviewed in the passenger seat of the unlocked patrol vehicle. When Linskens asked if Reed knew the Brown Bears, Reed responded that although he did not know Lorraine as much, Harry "was his guy," and he would go to the Brown Bears' home "from time to time, drink beer with [Harry], [and] ask him for cigarettes." At the end of their discussion, Linskens asked if Reed would consent to giving a DNA sample, explaining that they were asking anyone who had been in the Brown Bear residence to submit their DNA. Reed verbally agreed and also signed a "Consent to Obtain DNA Sample" form.

¶5 The State Crime Laboratory later confirmed that Reed's DNA matched the blood stain DNA found on the Brown Bears' bed which, as noted above, matched the DNA found on the knife next to Harry's body. Reed was arrested at his home, transported to the sheriff's department, and was informed of his *Miranda*[3] rights. After waiving those rights, Reed confessed to killing the Brown Bears and to taking a gun he found in the bedroom.

---

[2] The officers had earlier questioned both Metoxen and Melchert in relation to the murders.

[3] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

¶6     The State charged Reed with two counts of first-degree intentional homicide.  Reed moved to suppress his DNA sample and subsequent statements following what he claimed was a "stop and search" without "probable cause."[4] The circuit court denied the suppression motion after a hearing, and Reed subsequently pleaded no contest to the crimes charged.  In exchange for Reed's no-contest pleas, the State agreed to recommend concurrent sentences, and cap its sentence recommendation at thirty-five years of initial confinement.  The court imposed concurrent life sentences and made Reed eligible for release after forty-five years.  This appeal follows.

## DISCUSSION

¶7     On appeal, Reed argues he was unlawfully stopped and seized before consenting to provide a DNA sample, thus requiring suppression of the DNA evidence and subsequent statements to law enforcement as fruit of the poisonous tree.  The Fourth Amendment to the United States Constitution protects against unreasonable seizures.  *State v. Young*, 2004 WI App 227, ¶13, 277 Wis. 2d 715, 690 N.W.2d 866, affirmed, 2006 WI 98, 294 Wis. 2d 1, 717 N.W.2d 729.  This constitutional provision is not implicated "until a government agent 'seizes' a person."  *County of Grant v. Vogt*, 2014 WI 76, ¶19, 356 Wis. 2d 343, 850 N.W.2d 253.  And when a seizure has occurred, Fourth Amendment jurisprudence focuses on the reasonableness of the police/citizen interaction that constituted the seizure.  *Id.*, ¶26.

---

[4] Reed also filed a motion to suppress his confession on grounds the officers attempted to elicit "consciousness of guilt" responses prior to reading him *Miranda* warnings.  Reed, however, subsequently withdrew his claim of a *Miranda* violation.

¶8      There are two kinds of permissible seizures: ***Terry***[5] stops and arrests. ***Id.***, ¶¶27-28. "A ***Terry*** stop is an investigatory stop for which a law enforcement officer must have reasonable suspicion 'in light of his experience that [wrongful] activity may be afoot.'" ***Id.***, ¶27 (citation omitted). An arrest "normally involves a trip to the station house and prosecution for crime." ***Id.***, ¶28. Reed argues the former is implicated here.

¶9      As a threshold matter, the State argues that Reed forfeited his claim that law enforcement lacked reasonable suspicion to stop him by failing to adequately raise the argument until his post-suppression hearing briefing. However, the State does concede that defense counsel suggested during the suppression hearing that part of Reed's challenge might include a challenge to the legality of the seizure. In any event, it is within this court's discretion to "disregard alleged forfeiture or waiver and consider the merits of any issue because the rules of forfeiture and waiver are rules of 'administration and not of power.'" ***State v. Beamon***, 2013 WI 47, ¶49, 347 Wis. 2d 559, 830 N.W.2d 681 (citation omitted). Therefore, even were we to assume that Reed forfeited his ***Terry***-stop argument, we can disregard the alleged forfeiture. We choose to do so here and address the merits of the issue. We conclude that Reed has failed to establish that he was seized before consenting to give a DNA sample.

¶10     Whether someone has been seized presents a question of constitutional fact that we review using a two-part standard of review. ***State v. Williams***, 2002 WI 94, ¶17, 255 Wis. 2d 1, 646 N.W.2d 834. This court will uphold the circuit court's findings of fact unless they are clearly erroneous, but the

---

[5] *See **Terry v. Ohio***, 392 U.S. 1 (1968).

application of constitutional principles to those facts presents a question of law subject to de novo review. *Id.* The same standard of review applies to a ruling on a motion to suppress. *See State v. Hess*, 2010 WI 82, ¶19, 327 Wis. 2d 524, 785 N.W.2d 568.

¶11 The test for whether a seizure has occurred is an objective one, looking at the totality of the circumstances, and considering "whether an innocent reasonable person, rather than the specific defendant, would feel free to leave under the circumstances." *Vogt*, 356 Wis. 2d 343, ¶¶30, 38. There is no seizure "[u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he [or she] was not free to leave." *Immigration & Naturalization Serv. v. Delgado*, 466 U.S. 210, 216 (1984). When examining the totality of the circumstances, some considerations that may be relevant include whether more than one officer was present, whether the officers displayed their weapons, whether an officer made physical contact with the person, and whether an officer's language or tone suggested that compliance with the officer's request might have been required. *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Generally, "police-citizen contact becomes a seizure within the meaning of the Fourth Amendment when an officer by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Young*, 294 Wis. 2d 1, ¶18.

¶12 Here, upon the officers' request to Metoxen, Reed voluntarily exited Metoxen's house. After identifying themselves as law enforcement, the officers asked to have a conversation with the men, and Reed agreed to speak to Sergeant Linskens in the open driveway. Linskens testified at the suppression motion hearing that during their conversation he never told Reed he had to stay and talk and Reed neither expressed a desire to leave, nor did he attempt to walk away.

Linskens recounted that Reed never seemed confused by any of his questions and, in seeking consent to obtain a DNA sample, Linskens did not make any threats or promises to Reed, nor did he tell Reed he was required to give a sample. Based on the record before us, we agree with the circuit court's conclusion that this was a consensual encounter between law enforcement and Reed that did not amount to a seizure. As the court recounted: "[L]aw enforcement officers were outside [Metoxen's] home, weapons were not drawn. There were no threats. There was no coercion. There were no tricks. There was nothing misleading, nothing coercive." Thus, as the court determined, a reasonable person in Reed's position would have felt free to leave.

¶13    Reed asserts that his "freedom of movement" was nevertheless "restrained by the questioning about the homicides." We disagree. First, as noted above, we look to whether an innocent reasonable person, rather than the specific defendant, would feel free to leave under the circumstances. *See **Vogt***, 356 Wis. 2d 343, ¶¶30, 38. We are not persuaded that an innocent reasonable person would have felt forced to remain simply because an officer asked questions about serious crimes. *See **id.***, ¶24. Even if an innocent person would feel intimidated to stay, that does not necessarily transform the questioning into a seizure. That "most citizens will respond to a police request" does not make a consensual encounter a seizure. ***Delgado***, 466 U.S. at 216.

¶14    Reed also claims he was seized because law enforcement did not explicitly inform him he was at liberty to refuse to provide a DNA sample. However, the fact that most people will affirmatively respond to a police request "without being told they are free not to respond, hardly eliminates the consensual nature of the response." ***Delgado***, 466 U.S. at 216. Further, Reed's speculation that he might have faced arrest for obstructing an officer had he walked away is

7

not supported by the record and adds nothing to his argument. *See Vogt*, 356 Wis. 2d 343, ¶49 (rejecting consideration of speculation as to what might have occurred if defendant had tried to leave).

¶15    Although Reed mentions he was only nineteen years old at the time of the encounter, he does not develop an argument that his age somehow rendered him more susceptible to questioning. *See id.*, ¶31 ("a person's consent is no less valid simply because an individual is particularly susceptible to social or ethical pressures"). Reed also contends the officers' visible badges and service revolvers constituted a "show of authority" contributing to his seizure. Nothing in the record suggests that the weapons were referenced or used. We are not convinced that their presence and visibility alone rendered the officers' interaction with Reed a Fourth Amendment seizure.

¶16    Reed additionally suggests the officers were limited to questioning him about his identity or identification. We are not persuaded, as the United States Supreme Court has held that "police questioning, by itself, is unlikely to result in a Fourth Amendment violation." *Delgado*, 466 U.S. at 216. Further, if Reed were correct, such a limitation "would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices, such as the important tool of police questioning." *Mendenhall*, 446 U.S. at 554. Reed was not seized when he consented to provide a DNA sample. Therefore, the circuit court properly denied his motion to suppress the DNA evidence and subsequent statements to law enforcement as fruit of the poisonous tree.

        *By the Court.*—Judgment affirmed.

        This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.

8