STATE of Wisconsin, Plaintiff-Respondent,

v.

Keith A. DAVIS, Defendant-Appellant.

Supreme Court

*No. 2006AP1954–CR. Oral argument December 12, 2007.
—Decided June 26, 2008.*

2008 WI 71

(Also reported in 751 N.W.2d 332.)

585

For the defendant-appellant there were briefs and oral argument by *Chris A. Gramstrup,* Superior.

For the plaintiff-respondent there was oral argument by *Sally L. Wellman,* assistant attorney general, with whom on the brief was *J.B. Van Hollen,* attorney general.

¶ 1. ANNETTE KINGSLAND ZIEGLER, J. This case is before the court on certification by the court of appeals, pursuant to Wis. Stat. § (Rule) 809.61 (2005–06). Keith A. Davis was charged with first-degree sexual assault of a child in violation of Wis. Stat. § 948.02(1) (2003–04).[1] Davis sought to suppress all oral and written statements he provided to the Green Bay Police Department on December 17, 2003. The Brown County circuit court judge, Donald R. Zuidmulder, denied Davis's motion to suppress. Davis proceeded to trial and was convicted of first-degree sexual assault

[1] All subsequent references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

of a child. He now requests that his judgment of conviction be vacated and his case be remanded to the circuit court for a new trial, which would exclude his inculpatory statement. We decline that request and affirm Davis's conviction.

¶ 2. This case requires us to decide whether Davis's statement was so closely associated with the voice stress analysis that it must be suppressed. When a statement is so closely associated with the voice stress analysis that the analysis and statement are one event rather than two events, the statement must be suppressed. *State v. Greer*, 2003 WI App 112; ¶¶ 9–12, 265 Wis. 2d 463, 666 N.W.2d 518. As is the case with any statement, the statement must also survive constitutional due process considerations of voluntariness.

¶ 3. We conclude that Davis's statement was not so closely associated with the voice stress analysis as to render it one event. Rather, the examination and interview were two totally discrete events. Therefore, because his statement was given voluntarily and at a totally discrete interview, we conclude that Davis's statement was admissible.

I

¶ 4. On November 21, 2003, Detective James Swanson of the Green Bay Police Department went to the residence of Keith A. Davis to speak with him about an alleged sexual assault of a juvenile, K.L.D., d.o.b. 12/14/96. Davis invited the detective into the house. The detective informed Davis that he was not under arrest. Davis gave the detective a "tour" of his residence in response to the detective's request to look around for evidence. With consent, the detective collected bedding

589

from the alleged victim's room as well as a shaving cream container from a bathroom. It is unclear what else may have been said during that visit, but when the detective asked Davis if he would be willing to come down to the police department to talk about the incident, Davis said that he would drive himself to the station later. The detective left, and on that same date, Davis drove to the Green Bay Police Department and talked with Detective Swanson in the interview room. At the police station, Davis was informed again that he was not under arrest and was free to leave at any time. At the station, Davis answered some questions but denied the allegations. Several times during that interview and before Davis left, he offered to take a polygraph examination. At the conclusion of the interview, Detective Swanson told Davis that he may follow up with him with respect to Davis taking a polygraph or voice stress analysis test.

¶ 5. On December 17, 2003, Detective Swanson returned to Davis's residence around 8:00 a.m. The detective asked Davis if he would further discuss the alleged incident regarding K.L.D. and whether Davis was still willing to undergo a polygraph or voice stress analysis test. Davis said that he would drive himself to the police station, but he wanted to shower first. The detective then returned to the police station.

¶ 6. Around 9:00 a.m., Davis left Detective Swanson a voice message that his car would not start, so he would be walking to the Green Bay Police Department and would be later than expected. Due to the weather that day and the route Davis would need to take in order to get to the police department, Detective Swanson decided to get in his car and see if he could find Davis walking. The detective intended to offer Davis a ride. At around 9:15 or 9:20 a.m., as the detective was

driving south on Broadway, he saw Davis walking on the sidewalk. Davis waved at Detective Swanson. Detective Swanson made a u-turn, pulled up along side Davis, and asked him if he wanted a ride. Davis got in the front seat of Detective Swanson's unmarked squad car, and they proceeded to the Green Bay Police Department.

¶ 7. Once at the police station, Detective Swanson and Davis went into an interview room. Detective Swanson explained to Davis that he was not under arrest, did not have to talk with him, and could leave at any time. Davis said that he understood. Detective Swanson told Davis that he wanted to talk with him and have him take the voice stress analysis, which they had discussed before, and Detective Swanson told Davis that someone else would conduct the test. Davis was cooperative and wanted to talk.

¶ 8. Detective Swanson left the interview room and returned with Detective Buenning, the officer who conducted the test. After being introduced to Davis, Detective Buenning took Davis to another room, referred to as the "family room," for the voice stress analysis test. Detective Swanson did not accompany Davis to the "family room" for testing, nor was he present during the test.

¶ 9. Once in the room where Davis was to undergo the voice stress analysis, Detective Buenning explained the test and obtained Davis's consent.[2] Detective Buenning then asked Davis nine test questions,

---

[2] Davis signed and dated a form entitled "Green Bay Police Consent For Computer Voice Stress Analyst." Presumably, this consent form is pursuant to Wis. Stat. § 942.06, "Use of polygraphs and similar tests." The form reads:

I . . . Do hearby voluntarily consent to be [] examined by a trained computer voice stress analyzer of the Green Bay Police Depart-

which consisted of two relevant questions, five irrelevant questions, and two control questions. Davis actually helped formulate the following relevant questions: (1) "Did you put your penis into [K.L.D.'s] vagina?"; (2) "Did you put your penis in [K.L.D.'s] mouth?" Davis agreed that those were relevant questions. For the test, Detective Buenning used a laptop, and a lapel microphone was clipped onto Davis's collar. After the test, Davis went back to the original interview room. Detective Buenning reviewed the results, and then, pursuant to standard procedure, two other officers independently evaluated the results. All three officers separately concluded that Davis was being deceptive. Outside the presence of Davis, and in a separate room, Detective Buenning discussed the results with Detective Swanson. He told Detective Swanson that he believed Davis had been deceptive. Both detectives then went to the original interview room and then brought Davis back to the "family room."

¶ 10. With Detective Swanson in the "family room," Detective Buenning told Davis that his answers were deemed deceptive and showed Davis the results from the computer charts. Davis repeatedly said that he did not do anything. Detective Buenning then asked Davis, "Well, if you told me yourself that her hymen was busted, wouldn't that support the results of the test?"[3] Davis did not verbally respond but nodded his head up

ment. I understand that the operation of this device involves the recording of my voice to specific questions. I have had the nature of the examination explained to me by Det. Buenning of the Green Bay Police Department. I agree to be recorded and tested using the computerize[d] voice stress analyst. I hereby release the results of the examination to the investigating law enforcement agency.

[3] The record does not indicate—neither the direct examination nor the cross-examination of Detective Buenning—the origin of this question. At the suppression hearing, this ques-

and down. Detective Buenning asked if he wanted to talk about this and Davis said "yes." Detective Buenning asked Davis if he preferred to talk with Detective Swanson. Davis indicated that he did.[4] At that point, Detective Buenning stated, "I'm finished here" and then he closed up his laptop and left the room with all of the voice stress analysis equipment. Detective Buenning told Davis that he was finished with the test.[5]

¶ 11. Detective Swanson and Davis were then alone in the "family room." Detective Swanson stated, "Keith, there's some things we need to talk about reference [K.L.D.]." Davis nodded his head yes, and they then went back to the original interview room. Detective Swanson left Davis in the interview room and then went to get statement forms. Approximately five minutes later, at about 11:00 a.m., Detective Swanson asked Davis to explain what happened with K.L.D. As Davis gave a statement, Detective Swanson wrote it on the statement form. While Davis gave his statement,

---

tion is asked, but we are never told the context of the first time it was asked. It appears from the record that Detective Buenning and Davis had discussed this topic at some time.

[4] While the record does not reflect Davis's exact words, the testimony at the suppression hearing confirms that Davis wanted to talk with Detective Swanson:

Q. [Prosecutor] Did he agree to — did he say he wanted to talk to Detective Swanson?

A. [Detective Buenning] He wanted to talk to Detective Swanson.

[5] While the record does not reflect Detective Buenning's exact words, the testimony at the suppression hearing confirms that Detective Buenning told Davis the test was over:

Q. [Prosecutor] Did you actually tell Mr. Davis that you're finished with this test?

A. [Detective Buenning] Yes.

Detective Swanson did not mention or reference the voice stress analysis test or the results. When Davis was finished talking, the detective gave Davis the written document to review. Davis read the statement partly out loud and then to himself. Detective Swanson had him read the beginning of the statement out loud in order to make sure that Davis could read the officer's writing. Detective Swanson explained to Davis that if anything was incorrect or needed to be changed, Davis should correct it. However, Davis made no corrections. After reading the statement, Davis signed both pages, and the statement was completed at about 11:45 a.m.

¶ 12. After Davis signed the statement, he "kind of broke down" and was crying. He stated that he "felt like he wanted to die." Around noon that day, Detective Swanson took Davis to the crisis center. Detective Swanson did not have further contact with Davis that day.

¶ 13. On February 16, 2004, Davis was charged with one count of first-degree sexual assault of a child contrary to Wis. Stat. § 948.02(1). On May 28, 2004, a preliminary hearing occurred, and Davis was bound over for trial. Davis was arraigned on an information that charged him with one count of sexual assault. The information was amended on the day of trial, September 29, 2005, to include three counts of first-degree sexual assault of a child.

¶ 14. On June 11, 2004, Davis moved the circuit court to suppress all of his oral and written statements from December 17, 2003. On March 29, 2005, the circuit court conducted a hearing on the motion. On April 15, 2005, the circuit court issued an oral decision and denied the motion. The circuit court concluded that the statement was voluntarily given under *Goodchild*[6] and that

---

[6] *State ex rel. Goodchild v. Burke*, 27 Wis. 2d 244, 133 N.W.2d 753 (1965).

*Miranda* warnings were not required because Davis was not in custody at the time of the statement. The circuit court also concluded that, under *Greer*, the statement was admissible because it was distinct and separate from the polygraph or voice stress analysis. Relying on *Greer*, the circuit court cited the following four factors: (1) where was the statement taken; (2) who took the statement; (3) how soon after the polygraph examination was the statement taken; and (4) what was the manner in which the statement was taken.

¶ 15. The circuit court made a number of findings regarding the factors: First, it found that two officers were involved. One officer conducted the voice stress analysis and one officer secured the statement from Davis. Second, it found that the voice stress analysis had been completed when Davis made his statement. The circuit court stated, "in this case Mr. Davis was told that the polygraph or voice stress test had — had ended which is also a condition of *Greer*, that it was over . . . ." In addition, the circuit court found that Davis made his statement in a separate room from where the test was conducted. Third, the circuit court found that while there was a nominal period of time between the statement and the voice stress analysis, under *Greer* and *Johnson*,[7] time is the least of the factors to be considered. The circuit court concluded that, under a totality of the circumstances, the statements were admissible under *Greer*.[8]

---

[7] *State v. Johnson,* 193 Wis. 2d 382, 535 N.W.2d 441 (Ct. App. 1995).

[8] While it appears that a curative instruction was not given in this case, circuit courts may consider giving a curative instruction when deemed appropriate.

¶ 16. Davis proceeded to trial on September 29, 2005. A jury convicted him of all three counts of first-degree sexual assault of a child. On January 24, 2006, he was sentenced to 20 years of initial confinement followed by 10 years of extended supervision on each count to be served concurrent with each other.

¶ 17. Davis appealed his conviction. The court of appeals certified Davis's appeal to this court, and we accepted the certification. Specifically, the court of appeals stated, "we believe the law on this topic is in need of re-examination or, at a minimum, clarification." The court of appeals "respectfully suggest[ed] that the supreme court either clarify the rationale for the current rules or provide a new legal framework for analyzing this kind of evidence."

## II

¶ 18. We uphold the trial court's factual findings unless they are clearly erroneous. *Greer,* 265 Wis. 2d 463, ¶ 9. However, the application of constitutional principles to evidentiary or historical facts is a question of law that we review de novo. *Id.* Here, we review the voluntariness of the statements considering the principles of due process. *State v. Hoppe,* 2003 WI 43, ¶¶ 34–36, 261 Wis. 2d 294, 661 N.W.2d 407. In addition, statutory interpretation is also an issue of law, which we review de novo. *Megal Dev. Corp. v. Shadof,* 2005 WI 151, ¶ 8, 286 Wis. 2d 105, 705 N.W.2d 645.

## III

¶ 19. Similar to polygraph testing, a voice stress analysis is based upon the theory that an individual undergoes certain physiological changes when being

deceitful. Thomas R. Malia, *Admissibility of voice stress evaluation test results or of statements made during test,* 47 A.L.R.4th 1202 (1986). As a result, when being subjected to voice stress analysis, these changes can presumably be monitored and interpreted. *Id.* Voice stress analysis and polygraph testing have been used by law enforcement for many years.

¶ 20. Principles applicable to polygraph testing are equally applicable to voice stress analysis. *See* Wis. Stat. § 905.065(1); 7 Daniel D. Blinka, *Wisconsin Evidence* § 5065.1 (2d ed. 2001) (concluding that there is little reason to treat the forms of honesty testing mentioned in § 905.065 differently, "at least under the present state of the scientific art"). We see no reason at this time to treat these two methods of "honesty testing" differently.

¶ 21. Our analysis, as detailed below, primarily requires us to determine whether a defendant's statement was given at an interview totally discrete from the voice stress analysis. If the defendant's statement was given at an interview that was totally discrete from the voice stress analysis test, its admission is not automatically precluded. The statement, however, is also subject to ordinary principles of voluntariness. Therefore, if the statement is given at an interview that is totally discrete from the voice stress analysis test and the statement is voluntarily given, the statement is admissible.

¶ 22. Davis argues that "the administration of a voice stress analysis cannot be performed without it being unduly coercive." As a result, Davis argues that "any inculpatory statement given post-examination[,] which is determined to be closely related to the testing, must also then be excluded as being unduly coercive and involuntary." Davis argues that his post-

examination statement must be excluded because, under *Greer*, his statement was closely associated with the voice stress analysis he took that day. The State, on the other hand, argues that under *Greer*, the post-examination interview was not closely associated with the voice stress analysis so as to render it one event. The State asserts that under the totality of the circumstances, the statement was admissible. The State goes further to argue that a voluntary confession should always be admissible regardless of whether it was given before, during, or after a voice stress analysis.

A

¶ 23. Under the totality of the circumstances, we conclude that Davis's statement was not so closely associated with the voice stress analysis test so as to render it one event; rather, the statement and voice stress analysis were two totally discrete events. Whether a statement is considered part of the test or a totally discrete event is largely dependent upon whether the voice stress analysis is over at the time the statement is given and the defendant knows the analysis is over. *Greer*, 265 Wis. 2d 463, ¶ 12. To make this determination, the following factors should be weighed and considered: (1) whether the defendant was told the test was over; (2) whether any time passed between the analysis and the defendant's statement; (3) whether the officer conducting the analysis differed from the officer who took the statement; (4) whether the location where the analysis was conducted differed from where the statement was given; and (5) whether the voice stress analysis was referred to when obtaining a statement from the defendant. *See id.*, ¶¶ 12–16 (articulating and applying these principles).

¶ 24. This test has its origins in *McAdoo v. State,*[9] but in *State v. Schlise*[10] the factors were more clearly articulated. The factors were more recently applied in *State v. Johnson,* 193 Wis. 2d 382, 535 N.W.2d 441 (1995) and *Greer.*

¶ 25. In *McAdoo,* the defendant challenged the admission of his statement asserting that it was not given voluntarily because it was given immediately after a polygraph examination. *McAdoo v. State,* 65 Wis. 2d 596, 608–09, 223 N.W.2d 521 (1974). This court concluded, "the polygraph can hardly be considered a strategy of the police officers since it was administered to the defendant upon his request," and the statement was given after the test was over and the defendant knew the test was over. *Id.* The defendant underwent the first series of polygraph testing at 10:45 a.m., a lunch break was taken, and a second round of testing began at 2:00 p.m. *Id.* at 603. At 2:25 p.m., the defendant decided to discontinue the testing. *Id.* Due to that request, the testing equipment was removed from the defendant, turned off, and taken away. *Id.* After the examination's conclusion, the examiner proceeded to continue with questions. *Id.* The defendant "freely answered and talked for about forty-five minutes." *Id.* During the course of this discussion, the defendant admitted guilt. *Id.* The court concluded that, under *Goodchild,* the defendant's statement was voluntary and therefore admissible. *Id.* at 605–08.

¶ 26. In *Schlise,* we excluded statements made during a post-polygraph interview. *State v. Schlise,* 86 Wis. 2d 26, 42, 271 N.W.2d 619 (1978). The statements

[9] *McAdoo v. State,* 65 Wis. 2d 596, 223 N.W.2d 521 (1974).
[10] *State v. Schlise,* 86 Wis. 2d 26, 271 N.W.2d 619 (1978).

were excluded because no *Stanislawski*[11] stipulation had been effected.[12] *Id.* Immediately following that conclusion, however, we stated that "[t]his is not intended to suggest that all post-examination interviews between a subject and the examiner will be subsumed into the special category of polygraph evidence and fall within *Stanislawski*." *Id.* The court concluded that *Schlise* was distinguishable from *McAdoo* on its facts. *Id.*

¶ 27. Specifically, in *Schlise,* no evidence existed to suggest that the defendant was informed or was aware that the polygraph examination had ended. *Id.* While the defendant was not still connected to the machine, the court determined that this was not conclusive because the defendant was not connected to the machine during a pre-testing interview and that interview was considered part of the polygraph examination. *Id.* The officer used and referenced the charts and tracings generated from the polygraph examination. *Id.* at 43. The court found that even the polygraph examiner thought that the "post-polygraph" examination was a continuation of the test. *Id.* The examiner considered the subsequent interview to be the second part of a unified procedure. *Id.* Based on those facts, the court concluded that the post-mechanical interview was so

---

[11] *State v. Stanislawski,* 62 Wis. 2d 730, 216 N.W.2d 8 (1974).

[12] Prior to this court's decision in *Stanislawski,* no polygraph evidence was admissible, but the court, in *Stanislawski,* eliminated the unconditional rejection of polygraph evidence so long as certain conditions were satisfied. *Stanislawski,* 62 Wis. 2d at 736–42. However, in *State v. Dean,* this court overruled *Stanislawski. State v. Dean,* 103 Wis. 2d 228, 278–79, 307 N.W.2d 628 (1981).

closely associated with the mechanical testing, "both as to time and content," that it must be considered one event. *Id.*

¶ 28. In *Johnson,* the police officer conducted the polygraph examination, and then, the same police officer escorted the defendant to another room for questioning. *Johnson,* 193 Wis. 2d at 386. The court of appeals concluded that because the statements were made voluntarily and separately from the polygraph examination, the statements were admissible. *Id.* at 388–89. The court reasoned that the defendant was no longer attached to the equipment, was interviewed in a separate room from where the examination took place, and the police officer did not refer back to the polygraph examination or tell the defendant that he failed the test during post-examination questioning in order to elicit an incriminating statement. *Id.* While the court of appeals acknowledged the short amount of time between the examination and interview, it nonetheless concluded that a distinct break occurred between the two events. *Id.*

¶ 29. In *Greer,* the court of appeals stated that "[t]he touchstone of admissibility is whether the interviews eliciting the statements are 'found to be totally discrete from the examination which precedes them.'" *Greer,* 265 Wis. 2d 463, ¶ 10 (citation omitted). Citing to *McAdoo, Schlise,* and *Johnson,* it identified two "core factors" to be considered when making this determination: whether the defendant made the statements after the test was over and whether the defendant was told the test was over. *Id.,* ¶ 12. In consideration of these "core factors," the court of appeals found that prior to his confession, the defendant was told orally and in

601

writing[13] that the polygraph examination was over, and he was disconnected from the equipment, moved to another room, and one hour elapsed between the polygraph examination and the start of interrogation. *Id.*, ¶ 14. In addition, one police officer conducted the polygraph examination and a different officer conducted the post-examination interview. *Id.* Based on these facts, the court of appeals concluded that the examination and interview were two totally discrete events, and therefore, suppression was not required. *Id.*, ¶¶ 14–16.

¶ 30. In the case at hand, the voice stress analysis and the interview were totally discrete events: Two different officers were involved—one conducted the examination and the other conducted the interview. Before any statement was made, Detective Buenning stated, "I'm finished here," closed up his laptop, and left the room with all the voice stress analysis equipment. The interviewing officer did not refer to the polygraph examination or its results during the interview, and the examination and interview took place in different rooms.

¶ 31. While here, very little time passed between the examination and interview, time alone is not dispositive. For example, in *McAdoo,* the examination and interview were virtually seamless. However, in *McAdoo,* as in the case at hand, the interviewer never referred

---

[13] The defendant signed a polygraph examination form that specified the examination was over; it read, "I completely reaffirm in its entirety my above agreement. . . . I also understand that any questions I may be asked after this point in time, and any answers I may give to those questions, are not part of the polygraph examination." *State v. Greer,* 2003 WI App 112, ¶ 4, 265 Wis. 2d 463, 666 N.W.2d 518.

back to the polygraph examination or results, and the equipment was removed from the defendant. Even if little time passes between the two events, the statement may still be admissible so long as two totally discrete events occurred. *See Johnson,* 193 Wis. 2d at 389 (concluding that neither *Barrera v. State*[14] nor *Schlise* proscribe a bright-line rule of timing and instead look to the totality of the circumstances). "[W]here there is a distinct break between the two events and the post-polygraph interview does not specifically relate back to the . . . test, the events are sufficiently attenuated." *Johnson,* 193 Wis. 2d at 389. Unlike the case at hand, in *Schlise* the interview and examination were conducted by the same person, in the same room, and even the test examiner considered the procedure one event. *Schlise,* 86 Wis. 2d at 43.

¶ 32. Davis argues that the examination was not over when Detective Buenning, in the presence of Detective Swanson, told Davis that he failed the test and then "convinced" Davis that he should give a statement. However, the facts here reflect that the examination was complete when Detective Buenning talked with Davis about making a statement even if Davis had not been told the examination was over and the equipment had not been put away. That fact, however, does not render Davis's subsequent statement to Detective Swanson, at an interview totally discrete from the voice stress analysis, inadmissible given our totality of the circumstances approach.

■

¶ 33. First, while Detective Swanson was present in the "family room" when Davis indicated he wanted to talk, precedent clearly holds that the same officer may

[14] *Barrera v. State,* 99 Wis. 2d 269, 298 N.W.2d 820 (1980).

conduct both the examination and the interview so long as the two events are separate. *See McAdoo,* 65 Wis. 2d at 603, 608–09; *Johnson,* 193 Wis. 2d at 386, 388. Therefore, even though Detective Swanson was present in the "family room" when Davis said he wanted to talk, this does not preclude the subsequently made statement from being admitted. Second, Davis only agreed to give a statement when he was in the "family room" with both detectives, he did not begin giving a statement until he returned from the "family room" to the original interview room and five minutes had passed. Therefore, there is no concern that Davis began giving a statement to both detectives when he was confronted with his untruthfulness and as a result locked himself into a particular set of facts that he could not change once he began giving a statement to Detective Swanson. Third, so long as the examination and interview are two totally discrete events, "letting the defendant know that he or she did not pass the examination, or letting the defendant so conclude, does not negate that the examination and the post-examination interview are, as phrased by *Schlise,* 'totally discrete' events rather than 'one event.' " *Greer,* 265 Wis. 2d 463, ¶ 16. Fourth, at no time during the interview did Detective Swanson relate back to or rely on the voice stress evaluation or its results.

¶ 34. Under the totality of the circumstances and applying the *Greer* test, the voice stress analysis and Davis's statement were two totally discrete events. As a result, the statement is admissible under these facts so long as it is voluntary.

B

■

¶ 35. Even if the examination and interview are totally discrete from one another, a statement must still

be deemed admissible considering ordinary principles of voluntariness and constitutional principles of due process. *See Schlise,* 86 Wis. 2d at 44–45 (stating that voluntariness need not be considered here because the statement was excluded under *Stanislawski*); *Johnson,* 193 Wis. 2d at 389 (stating that "general rules of admissibility apply to the post-polygraph interview"); *see also* 9 Christine M. Wiseman, Nicholas L. Chiarkas & Daniel D. Blinka, *Criminal Practice and Procedure* § 20.42, 673 n.3 (1996) (discussing post-polygraph confessions).

¶ 36. "A defendant's statements are voluntary if they are the product of a free and unconstrained will, reflecting deliberateness of choice, as opposed to the result of a conspicuously unequal confrontation in which the pressures brought to bear on the defendant by representatives of the State exceeded the defendant's ability to resist." *Hoppe,* 261 Wis. 2d 294, ¶ 36; *see generally State ex rel. Goodchild v. Burke,* 27 Wis. 2d 244, 133 N.W.2d 753 (1965); 9 Wiseman, Chiarkas & Blinka, *supra,* § 20.42. We must then inquire whether the statements were the result of coercion or otherwise improper conduct by law enforcement. *Hoppe,* 261 Wis. 2d 294, ¶ 37. If neither coercion nor other improper conduct was used to secure the statement, it is deemed voluntary. *Id.*

¶ 37. This court applies a totality of the circumstances standard to determine whether a statement was made voluntarily. *Id.,* ¶ 38. We must balance the personal characteristics of the defendant, such as age, education, intelligence, physical or emotional condition, and prior experience with law enforcement, with the possible pressures that law enforcement could impose.

605

*Id.*, ¶¶ 38–39. Possible pressures to consider include the length of questioning, general conditions or circumstances in which the statement was taken, whether any excessive physical or psychological pressure was used, and whether any inducements, threats, methods, or strategies were utilized in order to elicit a statement from the defendant. *Id.*, ¶ 39.

¶ 38. In the case at hand, we conclude, as did the circuit court, that the defendant's statement was voluntary. The record contains no evidence that would give rise to any concerns regarding his personal characteristics. Davis, at the time this occurred, was 43 years old. While the defendant's brief indicates that Davis only possesses a middle school level education, we must defer to the trial court's judgment that Davis was not at such an educational disadvantage to render his personal characteristics at issue.

¶ 39. We also do not find evidence that law enforcement used coercion or other forms of improper conduct in order to elicit Davis's incriminating statement. The duration of questioning was not lengthy, no physical or emotional pressures were used, and no inducements, threats, methods, or strategies were employed to ascertain an incriminating statement from the defendant.

¶ 40. Davis's participation was voluntary in every way: Davis agreed to talk and take the voice stress analysis when he was in his own home. Davis came to the police station on his own terms including when and how he intended to get there. He received a ride from law enforcement when his car would not start. Davis waved at the officer and rode in the front passenger seat of the police car. Once at the police station, he was told he was not under arrest and he was free to leave at any

time. After the voice stress analysis, Davis said he wanted to talk, and he chose which officer he was going to talk with and give his statement. In short, Davis set the timing and the circumstances of coming to the police station, taking the test, and to whom he would ultimately give his statement.

¶ 41. Davis argues that Detective Buenning told Davis that he failed the voice stress analysis and referred to that information to "undermine the defendant's will to resist the official accusation." However, the record does not support that conclusion. In a very brief amount of time, Davis was told that the analysis indicated Davis was being deceptive, he was asked a question regarding his truthfulness, he was asked if he wanted to talk, and Davis said that he wished to speak with Detective Swanson. *Compare with Schlise,* 86 Wis. 2d at 40–41. Separately, he gave a statement to Detective Swanson, which he read and approved.

¶ 42. Merely because one is administered a voice stress analysis or polygraph test does not render a subsequent statement per se coercive. The proper inquiry is not only whether a test was taken, but rather, whether a subsequent statement was given at a distinct event and whether law enforcement used coercive means to obtain the statement. An important inquiry continues to be whether the test result was referred to in order to elicit an incriminating statement. *See Johnson,* 193 Wis. 2d at 389. Here, Davis did not make a statement to Detective Buenning, the tester. There is no question that the test was over. Davis had gone from one room to another room. In addition, the interviewer, Detective Swanson, never referenced the examination or its results during the time Davis gave his statement.

No coercive measures were used to elicit the statement. Accordingly, Davis's statement was voluntary.

C

¶ 43. In its certification to this court, the court of appeals expressed concern that no underlying rationale existed for excluding statements during or closely related to a polygraph examination or voice stress analysis. In its brief, the State also asserted that no justifiable reason existed for excluding statements made during a polygraph examination or voice stress analysis. The State, citing to a number of cases from other jurisdictions,[15] argues that Wisconsin should adopt a voluntariness approach to statements made before, during, or after any form of honesty testing.

¶ 44. While some prior precedent from this court and the court of appeals may not have clearly or perhaps even properly articulated the underlying ratio-

---

[15] The State cites to other jurisdictions that have rejected the approach that voluntary statements made during a polygraph must be excluded merely because they were given during a polygraph examination. *See Hostzclaw v. State,* 351 So. 2d 970, 971–72 (Fla. 1977), *overruling State v. Cunningham,* 324 So. 2d 173 (Fla. Dist. Ct. App. 1975); *State v. Blosser,* 558 P.2d 105, 107–08 (Kan. 1976); *Rogers v. Commonwealth,* 86 S.W.3d 29, 36 (Ky. 2002); *Commonwealth v. Hall,* 14 S.W.3d 30, 31–32 (Ky. Ct. App. 1999); *State v. Blank,* 955 So. 2d 90, 109–10 (La. 2007); *State v. Bowden,* 342 A.2d 281, 285 (Me. 1975); *State v. Erickson,* 403 N.W.2d 281, 283–84 (Minn. Ct. App. 1987); *State v. Smith,* 715 P.2d 1301, 1309–10 (Mont. 1986); *People v. Sohn,* 539 N.Y.S.2d 29, 31 (N.Y. App. Div. 1989); *State v. Green,* 531 P.2d 245, 252 (Or. 1975); *Commonwealth v. Schneider,* 562 A.2d 868, 870–71 (Pa. Super. Ct. 1989). *See also* Joel E. Smith, *Admissibility in evidence of confession made by accused in anticipation of, during, or following polygraph examination,* 89 A.L.R.3d 230, § 3 (Westlaw 2007).

nale for excluding statements made during honesty testing,[16] the underlying rationale is simply that our state legislature has generally precluded such a sce-

[16] For example, in *Schlise,* statements were considered part of the polygraph examination and not a discrete event, and therefore, the statements were excluded because no *Stanislawski* stipulation had been entered and, therefore, no polygraph evidence could be utilized. *Schlise,* 86 Wis. 2d at 43–44. However, *Schlise* seems to have misinterpreted *Stanislawski* if it interpreted *Stanislawski* to pertain to anything more than test results or testimony about the test results. This court's *Stanislawski* decision pertained to polygraph results and expert testimony based upon the examination; it did not address statements made during a polygraph examination. *See Stanislawski,* 62 Wis. 2d at 736, 741–44. The court stated: "Henceforth, in Wisconsin, expert opinion evidence as to polygraph tests may be admitted in a criminal case subject to the following conditions." *Id.* at 741. Further support for the proposition that *Stanislawski* only considered test results and expert opinion on test results is that *Stanislawski* withdrew the "unconditional rejection of polygraph evidence" that was established in *State v. Bohner. Id.* at 736, 741. However, *Bohner* and its progeny addressed only polygraph test results and expert opinion regarding those results. *See State v. Bohner,* 210 Wis. 651, 658, 246 N.W. 314, 317 (1933) (stating that "the systolic blood pressure deception test has not yet gained such standing and scientific recognition among physiological and psychological authorities as would justify the courts in admitting expert testimony deduced from the discovery, development, and experiments thus far made"); *State v. Baker,* 16 Wis. 2d 364, 368, 114 N.W.2d 426 (1962) (citing to *Bohner* and stating that "[t]he results of such a test are inadmissible, as the state concedes"). Cases relying on *Schlise* only perpetuate its misinterpretation and fail to acknowledge the existence of Wis. Stat. § 905.065. *See, e.g., Greer,* 265 Wis. 2d 463, ¶ 9 (failing to cite to Wis. Stat. § 905.065 but citing to *Schlise* and stating that "anything that a defendant says during what is considered to be part of the polygraph examination is not admissible"). Prior to the creation of Wis. Stat. § 905.065, admissibility of statement made during a polygraph examination seems to have been governed by princ-

nario under the plain language of Wis. Stat. § 905.065.[17] Wisconsin Stat. § 905.065(2) states, "[a] person has a privilege to refuse to disclose and to prevent another from disclosing any oral or written communications during or any results of an examination using an honesty testing device in which the person was the test subject."

¶ 45. Therefore, the legislature has decided that statements made during honesty testing are generally excluded, but if those statements are given at an interview that is totally discrete from the honesty

iples articulated in *Turner v. State*, 76 Wis. 2d 1, 23–26, 250 N.W.2d 706 (1977).

[17] In its certification to this court, the court of appeals brought our attention to Wis. Stat. § 905.065 stating that "this statute was created by the legislature during the *Stanislawski* era, at a time when polygraph examination results were admissible [under certain conditions]. . . . To the extent that this statute still has applicability in the post-*Stanislawski* era, it may provide defendant's with a method . . . of suppressing statements they made during an examination." We agree that this statute generally precludes statements made during honesty testing. We note, however, that the legislative history of the statute does not appear to reference *Stanislawski*. Moreover, the privilege was not included in the original draft, but rather, it was subsequently added by the judiciary committee. The driving force behind the statute appears to be employment situations, but this does not limit its application in this case. While test results are no longer admissible as a result of our decision in *Dean*, which prohibited the *Stanislawski* stipulation approach of admitting polygraph evidence, *Dean*, 103 Wis. 2d at 278–79, this does not eliminate the applicability of Wis. Stat. § 905.065 to statements made during honesty testing. Our decision in *Dean* did not address Wis. Stat. § 905.065. "[R]egardless of any stipulation the results of 'lie-detector tests' are inadmissible in Wisconsin courts because they fail the test of relevance." 7 Daniel D. Blinka, *Wisconsin Evidence* § 5065.1 (2d ed. 2001).

testing, under the factors articulated in this opinion, and the statement was given voluntarily, then the statement is admissible. However, if the statements and examination are not totally discrete events but instead are considered one event, then the statements must be excluded by virtue of Wis. Stat. § 905.065.

## IV

¶ 46. We conclude that Davis's statement was not so closely associated with the voice stress analysis as to render it one event. Rather, the examination and interview were two totally discrete events. Therefore, because Davis's statement was given voluntarily and at a totally discrete interview, we conclude that Davis's statement was admissible.

By the court.—The judgment of the circuit court is affirmed.

¶ 47. ANN WALSH BRADLEY, J. (*dissenting*). I agree with the majority that Davis's statements are admissible if the voice stress examination and the post-examination interview in which Davis made the inculpatory statement are totally discrete events. In addition, I agree with the majority that determining whether they are totally discrete events requires an examination of the totality of circumstances test, as explained in *State v. Greer*, 2003 WI App 112, ¶ 11, 265 Wis. 2d 463, 666 N.W.2d 518.

¶ 48. However, I disagree with the majority's analysis because it alters the essential inquiry and misapplies the totality of the circumstances test. The proper inquiry and application of the totality of the circumstances test require the conclusion that the examination and the interview here were not totally

611

discrete. A review of our precedent further supports that conclusion. I therefore respectfully dissent.

## I

¶ 49. This is not a case in which the examination clearly took place in one room and the interview clearly took place in another room. Rather it is a case where there was an ongoing process with both the examination and the interview occurring in two places.

¶ 50. A review of the relevant facts here is helpful as a preface to the analysis. While at the police station, Detective Swanson met with Davis in an interview room. Swanson left and returned with Detective Buenning. Davis was escorted by Buenning to the family room where the voice stress examination was conducted in Swanson's absence.

¶ 51. After the test, Davis was returned to the interview room. Buenning told Swanson that he believed Davis had been deceptive. Both detectives then escorted Davis back to the family room.

¶ 52. While in the family room, with Swanson present, Buenning confronted Davis and told him that his answers had been deceptive, showing him charts of the test results. Although Davis protested that he had not done anything, Buenning continued to press him. Eventually Davis capitulated and acknowledged the results. Buenning then asked Davis if he wanted to talk. Davis responded "yes." Buenning asked if Davis preferred to talk to Swanson, and Davis indicated that he did. Then Buenning said "I'm finished here," closed his laptop, and left the family room with the examination paraphernalia.

¶ 53. Next, Swanson spoke to Davis, indicated that they needed to talk, and took Davis back to the interview room. He left the room to retrieve forms,

returning within five minutes. When Swanson returned, Davis made the statements at issue here.

## II

¶ 54. The majority states that the issue in the case is "whether Davis's statement was so closely associated with the voice stress analysis that it must be suppressed." Majority op., ¶ 2. It asserts that a statement made during a voice stress analysis is generally inadmissible by virtue of Wis. Stat. § 905.065, *id.*, ¶ 45, but ultimately concludes that the statement at issue here was made after the analysis was completed and that the statement is admissible.[1]

¶ 55. According to the majority, the question of whether Davis's statement is admissible depends on whether the statement and the voice stress examination were two discrete events. *Id.*, ¶ 23. In order to determine whether the examination and the statement are totally discrete, the majority applies a totality of the circumstances test based on *Greer.*

¶ 56. The majority concludes that there were discrete events. It bases its conclusion on the facts that there were two officers involved, and that Buenning

---

[1] The majority concludes that the underlying rationale for excluding statements made during honesty testing is that "our state legislature has generally precluded such a scenario under the plain language of Wis. Stat. § 905.065." Majority op., ¶ 44. The majority's conclusion seems problematic for two reasons.

First, its conclusion implies that the opinion should resolve the present case by interpreting and applying § 905.065. However, the majority does not purport to do this.

Second, the majority resolves this case by relying upon a line of cases, none of which interprets or applies § 905.065. How can the rationale underlying a rule established in these cases be a statute that none of the cases ever mentions?

stated that he was finished, closed his laptop, and left with the examination equipment before Davis made his statement. *Id.*, ¶ 30. Further, the majority explains that Swanson did not refer to the examination or results during the time that Davis made the statements, and that the examination and Davis's statements occurred in different rooms.

## A

¶ 57. The problems with the majority's analysis begin with its statement of the inquiry. In *State v. Schlise* this court determined that the admissibility of statements made after a polygraph examination turns on whether the interview in which statements are made is totally discrete from the examination. 86 Wis. 2d 26, 42, 271 N.W.2d 619 (1978). Following *Schlise,* the court of appeals in *Greer* stated that the admissibility turns on "whether the interviews eliciting the statements are found to be totally discrete from the examination which precedes them." 265 Wis. 2d 463, ¶ 10 (internal quotations omitted).

¶ 58. At several points in the opinion, the majority correctly states that the inquiry is whether the examination and interview were two discrete events. However, in the analysis section the majority alters the test set forth in *Schlise* and *Greer* and instead asks whether the examination and Davis's *statement* are discrete events. Majority op., ¶ 23.

¶ 59. By altering the test, the majority implies that the post-examination interview commenced when Davis began making his statement. That assumption is untenable. The majority recognizes that the voice stress examination was over when Davis was unhooked from the voice stress analysis equipment. *See id.*, ¶ 9. What

it fails to acknowledge, however, is that when Buenning and Swanson escorted Davis to the family room and confronted him with the test results, they were initiating the post-examination interview.

¶ 60. *Schlise* and *Greer* demand that we analyze whether Davis's statements occurred during an interview that was totally discrete from the examination. Thus, the proper analysis should focus on whether the interview, including the period during which Davis was in the family room with both Buenning and Swanson, is totally discrete from the examination. Yet the majority does not examine the interview as including that period.

B

¶ 61. The majority opinion is also problematic in its application of the test it sets forth. It sets forth five factors from *Greer* that are relevant in determining whether the voice stress examination and the interview are totally discrete:

> (1) whether the defendant was told the test was over; (2) whether any time passed between the analysis and the defendant's statement; (3) whether the officer conducting the analysis differed from the officer who took the statement; (4) whether the location where the analysis was conducted differed from where the statement was given; and (5) whether the voice stress analysis was referred to when obtaining a statement from the defendant.

Majority op., ¶ 23. As noted, in *Greer* the factors refer to the "interview" rather than the "statement."

¶ 62. Rather than examining the five factors in a straightforward way, determining whether each factor indicates that the events were totally discrete, the

615

majority lists several factors that indicate that the events are discrete. *Id.*, ¶ 30. When it reaches the factors that indicate that the events are related, it discounts them on the ground that the events are totally discrete.

¶ 63. A close analysis of factors, however, reveals that the examination and the interview here were not discrete events. I examine each in turn.

### 1. Was the defendant told the examination was over?

¶ 64. Buenning did not give Davis any indication that the examination was over until well into the post-examination interview, when he stated "I'm finished here." Moreover, Buenning's statement that "I'm finished here" is equivocal. Both Buenning and Swanson were in the family room at the time, Buenning had just asked Davis if he would prefer to talk to Swanson, and Davis had responded that he would. Thus, Buenning's statement can be interpreted to mean that he was finished, not that the examination was finished.

### 2. Did any time pass between the examination and the interview?

¶ 65. The majority focuses on the five minutes between Buenning packing up the voice stress analysis equipment and Davis giving his statement to Swanson. Although it concedes that the short period of time is an indication that the events are not discrete, the majority merely states that "time alone is not dispositive." *Id.*, ¶ 31.

¶ 66. The important point, however, is that after Davis agreed to give a statement, only enough time passed for him to be escorted to a different room and for

616

Swanson to retrieve some paperwork. After the break, things picked up precisely where they had left off, with Davis agreeing to give the statement that had been elicited by Buenning in the family room. It is incorrect to suggest that there are totally discrete events when the break between them was so short and the subject of discussion (that Davis had previously not told the truth and would now agree to give a truthful statement) was identical before and after the break.

3. Was the officer conducting the examination different from the officer conducting the interview?

¶ 67. The majority maintains that different officers conducted the exam and the interview. However, as noted, the interview began when both Buenning and Swanson were in the family room with Davis. Both were present when Davis capitulated and conceded the results of the test, agreeing to give a statement.

¶ 68. Although only Swanson was present in the room when Davis gave his statement, Swanson merely asked Davis to give his statement after Davis had already agreed to give it while they were in the family room. The interview (that is, all of the discussion regarding Davis's actions and the examination) took place in the family room with Buenning. Thus, while there were two officers involved, both conducted the interview. Because Buenning was involved in both the examination and the interview, the officer conducting the examination was not different from "the" officer conducting the interview.

4. Was the location of the examination different from the location of the interview?

¶ 69. Although the post-examination interview began in the same room in which the examination was

conducted, Davis was moved to the interview room to give his statement to Swanson. More importantly, though, this is a case in which there was an ongoing process.

¶ 70. Davis was at the police station for the purpose of the examination. He was moved back and forth between the interview room and the family room several times. Davis had been in both rooms with both officers. As noted above, this is not a case in which the examination and the interview each clearly took place in a single room. Rather, it is a case in which there was ongoing process, including an examination and an interview, which occurred in two places.

5. Were the examination results used in obtaining the statement?

¶ 71. There is no question that the results of the examination were used to obtain Davis's statement. The majority maintains that "so long as the examination and interview are two totally discrete events, letting the defendant know that he or she did not pass the examination . . . does not negate that the examination and post-examination interview are . . . totally discrete events." Majority op., ¶ 33. However, the use of examination results is a factor to consider in determining whether there are two discrete events. Discounting the factor on the ground that there are two discrete events just begs the question.

¶ 72. The majority also maintains that "at no time during the interview did Detective Swanson relate back to or rely on the voice stress evaluation or its results." *Id.* The reason is that Swanson did nothing but ask Davis to recite the statement that Buenning had elicited from Davis a few minutes prior.

618

¶ 73. The factors cited by the majority therefore indicate that there were not two totally discrete events. Whether Davis was told the exam was over is unclear; there was essentially no time breaking up the events involved; both officers were involved in the process and Buenning performed most of the interviewing; the two rooms were each used for both the examination and the interview; and the examination results were used during the interview to elicit Davis's statement.

## C

¶ 74. Finally, a review of prior cases supports the conclusion that the examination and the interview were not discrete events. This case closely resembles *Schlise,* where an officer conducted a polygraph examination and a post-examination interview that were both a part of a longer, seamless process. That process included a lengthy pre-examination interview, the actual polygraph examination, and the post-examination interview, all conducted by one officer. 86 Wis. 2d at 42–43. The post-examination interview involved the officer confronting the defendant with the results of the test, thereby eliciting an incriminating statement. *Id.* at 40. This court determined that the examination and the interview were so closely associated in time and content that they had to be considered one event. *Id.* at 43.

¶ 75. The present case is similar. Davis was given the voice stress examination, which was over when he was unhooked from the equipment and escorted to the interview room. Swanson and Buenning brought Davis back into the family room and confronted him with the results of the test in a post-examination interview. During the interview Buenning used the results of the test to elicit a statement from Davis. Davis was taken

619

back to a room he had been in and out of during the entire process so that he could put his statement in writing.

¶ 76. Thus, as in *Schlise,* there was a single, ongoing process, the post-examination interview was conducted by the officer that conducted the examination, and the results of the test were used to elicit an inculpatory statement. The primary difference between this case and *Schlise* is that this case involved two officers, both of whom were involved in the entire process. Further, while there were two rooms involved, each had been used throughout the ongoing process.

¶ 77. This case is also different in important ways from *Greer* and *State v. Johnson,* 193 Wis. 2d 382, 535 N.W.2d 441 (Ct. App. 1995), in which the examinations and interview were discrete. In *Greer,* one officer spoke to the defendant the day before the defendant was given a polygraph examination. The examination was conducted by a different officer. After it was completed, the defendant was told orally and in writing that the examination was over. 265 Wis. 2d 463, ¶¶ 3–4. An hour passed and the defendant was moved to a different room. There, the first officer conducted an interview in which the defendant confessed. *Id.,* ¶ 7. The court of appeals determined that the examination and the interview were not totally discrete. *Id.,* ¶ 16.

¶ 78. In *Greer* the statement that the examination was over was clear, whereas here the statement was equivocal. The defendant in that case had an hour to differentiate between the examination and interview, whereas Davis had only long enough for Swanson to retrieve paperwork. The officers in *Greer* played distinct roles, whereas both officers here were involved throughout the process. Although this case involves two rooms, as did *Greer,* it is distinct in that both rooms

were used throughout the process. The *Greer* court determined that the officer's use of the examination results during the interview did not alone prevent the examination and interview from being discrete. *Id.*, ¶ 14. Nonetheless, it recognized that using the results counts against a determination that the events are totally discrete. *Id.*, ¶ 11.

¶ 79. The court of appeals determined in *Johnson* that there were discrete events even though there was only one officer conducting the examination and the interview. 193 Wis. 2d 382, 389. It based the determination on the facts that the defendant was moved to a different room, there was a distinct break between the two events, and the officer did not refer to the test results in order to elicit the inculpatory statement. *Id.* There is no indication that the interview room had been used throughout the process, as is the case here. More importantly, in this case it was the use of the test results that elicited Davis's statement. Further, Davis's statement to Swanson came directly after Buenning had induced him to give it, with only enough time passing for Swanson to retrieve paperwork.

¶ 80. Because this case is similar to *Schlise,* and distinct from *Greer* and *Johnson,* the case law favors the conclusion that the examination and the interview were not discrete events.

### III

¶ 81. In sum, the majority has altered the focus of the inquiry set forth in Greer and Schlise. As a result of skewing the focus, it incorrectly assumes that the post-examination interview commenced when Davis made his statement. Additionally, the majority misapplies the totality of the circumstances test. I conclude

the proper inquiry and application of the totality of the circumstances test, together with our prior case law, requires the conclusion that the examination and the interview here were not discrete events. I therefore respectfully dissent.

¶ 82. I am authorized to state that Chief Justice SHIRLEY S. ABRAHAMSON joins this dissent.